LADNER *v.* MERCHANTS BANK & TRUST COMPANY, et al.

No. 43273          February 8, 1965          171 So. 2d 503

*P. D. Greaves,* Gulfport; *Bryan & Gordon,* Pascagoula, for appellant.

*Rae Bryant,* Gulfport; *Gex, Gex & Phillips,* Bay St. Louis, for appellee.

Kyle, P. J.

This case is before us on appeal by Carl S. Ladner, plaintiff, from a judgment of the Circuit Court of Hancock County rendered in favor of the plaintiff against the Merchants Bank & Trust Company and Carlton G. Burrow, defendants, in an action for damages for personal injuries sustained by him in an automobile accident, which occurred on August 7, 1961.

The record shows that the appellant was an employee of Credit Laundry and at the time of his injury was engaged in picking up laundry for his employer; that the appellant was driving a Metro-Mite laundry truck in a northerly direction on South Beach Boulevard in the Town of Waveland, when a 1956 Lincoln automobile which was owned by the appellee Merchants Bank & Trust Company, and was being driven in a southerly direction on South Beach Boulevard by the appellee, Carlton G. Burrow, an employee of the Merchants Bank & Trust Company, collided with appellant's laundry truck. The accident occurred at approximately 10:30 A.M., a short distance west of the point of intersection of Nicholson Avenue with South Beach Boulevard in the Town of Waveland. The boulevard on which the accident occurred was a paved two-lane highway running generally northeasterly and southwesterly alongside a concrete seawall which separated the roadway from the Gulf shore line. A light rain was falling at the time of the accident, but a short time before there had been a heavy rain. The street was partially covered with water. The defendant

Carlton Burrow was enroute from the bank in Bay St. Louis to a branch office in Waveland to pick up bank items and take them back to the bank's main office in Bay St. Louis.

The declaration in this case was filed on January 21, 1963. After a brief statement of the facts the declaration charged that the defendant Burrow was operating his vehicle at an excessive and dangerous rate of speed; that he negligently failed to keep his automobile under constant and easy control; that he negligently failed to decrease the speed of his vehicle under the conditions of travel then prevailing; and that he negligently, carelessly and unlawfully drove his automobile at such excessive rate of speed that he lost control of the vehicle and drove it across the center line of the highway and into and against the plaintiff's laundry truck which was proceeding northwardly in its proper lane of travel, with such great force and impact that the laundry truck was demolished and the plaintiff was seriously and permanently injured. The plaintiff further alleged that, as a result of the violent impact, the plaintiff suffered a comminuted fracture of the left leg and the bones in his left knee were completely severed, and the muscle and ligaments of his left leg were torn, strained, damaged and ruptured; that he suffered five fractured ribs and contusions and abrasions over his entire body; and that as a result of the above mentioned injuries the plaintiff was totally and permanently disabled.

The case was tried at the September 1963 term of the court, and the jury returned a verdict for the plaintiff for the sum of $18,000, and a judgment was entered in favor of the plaintiff for that amount. The plaintiff filed a motion for a new trial on the ground that the court erred in granting an instruction to the defendants which permitted the defendants to invoke the rule of sudden emergency as a defense to the plaintiff's charge of negligence in the operation of the defendants' auto-

mobile, and on the ground that the verdict of the jury was grossly inadequate. The motion for a new trial was overruled, and from the judgment entered in the case and the order overruling the plaintiff's motion for a new trial, the plaintiff has prosecuted this appeal.

The appellant has assigned three points as ground for reversal of the judgment of the lower court, as follows:

(1) That the court erred in granting the appellee's instruction on sudden emergency; (2) that the verdict of the jury was so inadequate as to evince bias, passion and prejudice on the part of the jury; and (3) that the court erred in overruling the appellant's motion for a new trial. In view of the nature of the points argued as ground for reversal of the judgment, it is necessary that we give a brief summary of the testimony of the witnesses who had personal knowledge of the accident and the medical testimony relating to the plaintiff's injuries.

The defendant Carlton G. Burrow, being called to testify as an adverse witness by the plaintiff, testified that he was 19 years old and that, in August 1961, he was working for the Merchants Bank & Trust Company of Bay St. Louis, and on the day of the accident he was driving a 1956 Lincoln Fordor automobile from Bay St. Louis to the bank's branch office in the Town of Waveland; that he made trips to the branch office of the bank at Waveland every morning around ten o'clock to pick up bank items that had been brought in and carry them to the main office at Bay St. Louis. He had made the trip from Bay St. Louis to Waveland many times and was thoroughly familiar with the road, which was a two-lane paved highway known as the West Beach Boulevard, running alongside the Gulf Sound. He stated that he was on his way to the branch office at Waveland on August 7, 1961, when his Lincoln automobile ran into and collided with the plaintiff's laundry truck. He could not say how fast he was driving when he lost control

of his car. He was watching the road and not his speedometer. He stated, "I was traveling at a rate of speed I felt safe at, reasonable to me." He saw the plaintiff's truck approaching when he was 100 or 150 yards from the truck. It was raining. The street was wet and his car was throwing water on both sides of the road, but the road was not flooded. However, in places the water was running across the road. When he saw the plaintiff's truck it was on its own proper side of the highway, and when he struck the truck it was still on its own proper side of highway, right up against the seawall. He was unable to say whether the truck had come to a complete stop or not.

Burrow stated that his car started skidding sideways at a point on the highway where a shell built driveway went up a nine or ten foot hill; that the water had washed shells down to the highway, and as he was rounding a curve he saw that, and he intended to go around the shells, which would have represented a five or six foot adjustment; that as he was about to go around the shells he saw the laundry truck pull out ahead; that he had it in mind to go on and pull back into his own lane of travel, and as he hit his brakes he hit the shells and they threw him off and he lost control of his car. He was then a city block or more from the laundry truck, but when he hit his brakes the car went out of control and turned sideways and collided with the laundry truck. He hit the corner of the truck with the front part of his car. It was a hard collision. His car sideswiped the truck and finally came to a stop when it struck the seawall about 15 feet behind the truck. He admitted that his car struck the seawall with such force that it knocked the seawall down.

Burrow was asked whether, after the wreck happened, he told Carl Ladner, "It is all my fault." His answer was, "I don't know I was very excited and afraid." He denied that he had told Burney Benigo,

while talking to him at the Mardi Gras Lounge after the accident, that he was making 85 miles an hour. Burrow stated that he went to a house right across the road from the place where the accident occurred and called Mr. Fred Bougeois, the marshall, and reported the accident and asked him to call an ambulance. He then called his father on the telephone. Burrow admitted that he knew at the time of the hearing that the speed limit where the wreck occurred was 25 miles an hour.

The plaintiff, Carl S. Ladner, testified that he had picked up a package of laundry at Dr. E. C. Samuel's house on Waveland Beach and had driven about one hundred and thirty or forty feet northwardly when he first saw the on-coming Lincoln automobile. It was approximately 300 or 350 feet ahead of him at that time and was approaching him in its own traffic lane at a high rate of speed and was throwing up a spray of water on both sides. The plaintiff pulled his truck to the right against the concrete seawall and stopped, but left the motor running. When the automobile was about 250 or 260 feet from the truck the plaintiff saw that the driver of the automobile had lost control of his vehicle which started spinning and sliding on the paved highway. The automobile continued to spin and slide crossways of the road, and finally hit the left front of the laundry truck head-on and came to a stop when it crashed into an 8-foot span of the concrete seawall about 125 feet behind the laundry truck.

The plaintiff testified that the impact of the automobile against the left front of the truck knocked him against the back door of his truck. When he tried to get up he found that his leg was just dragging behind him. His knee was badly damaged. He was carried to the hospital in Bay St. Louis immediately and was examined by Dr. Thomas Quigley. The doctor told him that he needed surgery, and Dr. Armand J. Scully was called in and operated on the knee the next day. The

plaintiff suffered severe pain in his leg and in his chest and his fractured ribs. He remained in the hospital eight days. A cast was placed around his leg and a wheel chair was provided for him. He stayed in the wheel chair about a month and after that he moved around on crutches for a period of approximately four months. Dr. Scully operated on his knee a second time on February 19, 1962, at the Gulfport Memorial Hospital. He was in the hospital ten days, and was placed in a wheel chair again when he left the hospital. He continued to use the chair for a period of almost three months. He used crutches four or five months after that. He was using a walking cane at the time of the trial. The plaintiff stated that he had also received 89 physical therapy treatments, which were administered by a physical therapist specialist. His total medical and hospital bills amounted to $2531.04. The plaintiff testified that he had been unable to work since his injury; that he had received a 9th grade education; that he had a wife and three children whose ages were 10, 8 and 4 years. It was stipulated that the plaintiff had a life expectancy of 33 years based on the American Mortality tables.

On cross-examination the plaintiff testified that the Lincoln automobile started to spinning before it got to the Nicholson Avenue driveway. He estimated the speed of the approaching vehicle at 85 miles per hour.

Dr. Thomas Quigley testified that the plaintiff was in severe pain when he saw him at the Hancock General Hospital in Bay St. Louis, immediately after his injury. He also had a pain in the right chest and a lot of bruise marks up through his chest. His right wrist was sprained. He was given sedation and x-rays were taken. The x-rays showed a fracture of the left patella, or knee cap, which was separated. The whole bone was fractured in half and pulled apart, and there was also a lot of swelling of the joint, which indicated that there might be cartilage damage too. The right wrist was swollen

and painful, but he saw no fractures of the bone there at that time. X-ray of the chest revealed two fractured ribs on the left side, and two fractured ribs on the right side. The doctor stated that the lower end of the knee cap was broken off and pulled down, and when this happened all the tendons pulled apart. The doctor stated that after x-rays were made the plaintiff was given a large hypodermic to relieve his pain and was put to bed; that because of the separation of the two parts of the knee cap the fracture could not be set until he was operated on. The doctor stated that Dr. Armand J. Scully, an orthopedic consultant, was called in to see the patient a few hours later. Dr. Scully saw at once that a surgical operation was necessary, and the whole knee joint was opened up and made bare and the pieces of bone were brought together and wired together. A plaster cast was applied to the patient's leg. Dr. Quigley stated that he saw the patient at his home on two or three occasions during the week after he left the hospital. The patient was then referred back to Dr. Scully for additional care and treatment, and Dr. Quigley did not see him again.

Dr. Armand J. Scully testified that he first saw the plaintiff on August 8, 1961, in the Hancock General Hospital at Bay St. Louis. The plaintiff gave him a history of his injury in an automobile accident while he was driving a laundry truck. The doctor saw that the plaintiff had suffered a severe injury to his knee. The doctor stated that the plaintiff had a compound comminuted fracture of the patella or knee cap; that "compound" meant that the laceration exposed the bone to the outer surface, and "comminuted" meant that the bone was in more than two pieces. There were many pieces of small fragmented bone. There were two major fragments and several small pieces of various sizes in between the two major fragments. The plaintiff's knee was severly traumatized and open to the air surface.

The soft tissues interior to the knee joint were open and the knee joint was exposed. The interior patella tendon was partially severed. The doctor stated that the plaintiff had five fractured ribs on the right side, and a sprained wrist, and some small abrasions here and there.

The doctor stated that the plaintiff was taken to surgery and many small pieces of bone were removed. A circumferential wiring with heavy stainless steel wire was then performed on his knee cap, which brought the inferior pole of the knee cap and the remaining portion of the knee cap into proper position. That operation was performed at the Hancock General Hospital. The patient was in pain while he was in the hospital and sedatives had to be administered. Following the first surgery the leg was immobilized in plaster with plaster splints; but after a period of healing had transpired the immobilization was discontinued in an effort to get the patient to start moving his knee. The patient was on crutches during the time the leg was in splints.

The doctor stated that he had to go back later and remove the interior pole of the patella which had failed to unite by a bony union to the superior portion. The second operation was performed on February 16, 1962, in the Gulfport Memorial Hospital. The operation was performed because the bones of the knee cap did not unite. In the second operation the doctor opened the knee joint wide, and at that time it was noted that the patient had a small tearing of the cartilage inside of the knee joint. He also had a fibrous union of the patella, and some weakness in the medial collateral ligament in the knee, which is the ligament that supports the inner side of the knee joint. So that part of the patella was removed and the medial collateral ligament was shortened, in an attempt to give the patient a more stable knee joint. Following the second surgery, the patient stayed in the hospital from February 18 until February 28. The doctor stated that after the first

operation he recommended treatment by a physical therapist in an effort to increase the strength of the muscles of the leg and the stability of the knee. That treatment was obtained and in time proved to be helpful.

The doctor was asked what his prognosis of the patient's present condition was. His answer was that, on the basis of the amount of atrophy in his knee and from what he had seen, in his opinion, the patient would be permanently partially disabled somewhere in the neighborhood of about forty percent, that would be permanent disability. He did not think the patient would be able to return to his job as a laundry truck driver. As to whether he could perform any work that was strenous, that would depend on whether he had to do a lot of climbing or things of that nature. If he had to work as a mechanic in a garage or a service station attendant, the doctor thought he could perform that kind of labor, but if he had to work in construction work where he had to climb ladders and things of that nature the doctor thought he could not perform that type of work.

The doctor stated that the plaintiff had a permanent disability and that he had a weakened knee which would predispose him to injuries, and that he would always have some degree of pain and discomfort in his knee. The doctor was of the opinion that the broken rib bones had healed well. The sprained wrist was of a temporary nature and there would be no permanent effects from that. The doctor stated that the 40 percent permanent partial disability referred to above had reference to the knee.

■■ ■ We think the court erred in granting the appellee's instruction No. 8 in which the jury was told that, ''if you believe from the evidence, if any, that the defendant, Carlton G. Burrow, was immediately prior to the collision confronted with a sudden emergency which he did not create, and was by reason thereof placed in a position of peril to himself, then in weighing

the evidence and in determining whether or not Carlton G. Burrow was guilty of negligence at the time of the collision, you may take into consideration all the facts and circumstances as shown by the evidence, and the situation with which Carlton G. Burrow was confronted, and you must believe from a preponderance of all of the evidence in this case that Carlton G. Burrow was guilty of negligence which contributed to the collision before the plaintiff is entitled to a verdict at your hands.''

The court in our opinion erred in granting the above mentioned instruction for the reason that the evidence shows without dispute that the sudden emergency was an emergency of the defendants' own making. There is no substantial evidence in the record to support the claim that the defendant ''was immediately prior to the collision, confronted with a sudden emergency which he did not create.''

In 7 Am. Jur. 2d *Automobiles and Highway Traffic* section 360 (1963), the textwriter says:

> The sudden emergency rule cannot be invoked by one whose own negligence or wrongful conduct created the emergency or gave rise to a situation of peril. If a motorist, by his own negligence, has placed himself in a position of peril, and being called upon in sudden emergency to act mistakes the best course through an error of judgment, he is not thereby relieved. He is not permitted to create an emergency by his own negligence, such as by proceeding at a reckless or unlawful rate of speed or on the wrong side of the highway, and thereby derive protection by reason of the emergency so created. See also Continental Southern Lines v. Klaas, 217 Miss. 801, 65 So. 2d 575 (1953).

The defendant Burrow testified himself that he was familiar with the road on which he was traveling at the time of the accident. He knew of the conditions which existed on the Beach Boulevard running along

the Gulf Sound. He testified himself that the street was wet and the car was throwing water on both sides, and that in places the water was running across the road. The testimony clearly shows that he was driving at an excessive and dangerous rate of speed and that he lost control of his car as a result of his own negligent speed. When a situation of peril arises because of the driver's own negligence, the emergency rule cannot be invoked in his behalf.

A driver of an automobile cannot wholly ignore conditions which he knows to exist and be relieved of the responsibility with which he is charged under the law by claiming this known condition is an emergency. Kane v. Loyd's American Line, Inc., 247 Wis. 145, 19 N.W. 2d 296, 298 (1945).

We also think that the court erred in overruling the appellant's motion for a new trial on the ground that the verdict of the jury was so inadequate as to evince bias, passion and prejudice on the part of the jury. We are of the opinion that the damages awarded appellant in this case are so grossly inadequate as to evince prejudice and bias on the part of the jury. A mere statement of his injuries, medical expenses, and loss of earnings is sufficient basis for our conclusion. Whatley v. Delta Brokerage & Warehouse Company, 248 Miss. 416, 159 So. 2d 634.

The evidence shows that the appellant at the time of his injury was approximately 36 years of age, and that he had a life expectancy of 33 years based on American Mortality Tables. His medical expenses at the time of the trial amounted to $2,531.04. The appellant was making $110 per week at the time of his injury. The appellant had suffered loss of income from his employment at the time of the trial in the total sum of approximately $12,000, thereby making his actual damages approximately $14,531.04. The jury by its verdict appears to have allowed only about $3,500 for the pain

and suffering endured by the appellant and for his permanent injuries and loss of future earnings. The doctor testified that the appellant was permanently partially disabled somewhere in the neighborhood of 40 percent, and that would be permanent disability. He did not think the patient would be able to return to his job as a laundry truck driver. He would not be able to work where he had to climb ladders and things of that nature. There is no proof in the record to indicate that the appellant was guilty of negligence of any kind which contributed to his injury.

For the reasons stated the judgment of the lower court is affirmed as to liability and reversed and remanded for a new trial on the question of damages only.

Affirmed as to liability and reversed and remanded for a new trial on the issue of damages only.

*Ethridge, Gillespie, Rodgers and Patterson, JJ.,* concur.