839 F.2d 240
 Martha MOLTON, Administrator for the Estate of William
Molton, Plaintiff- Appellee, Cross-Appellant,
v.
CITY OF CLEVELAND, Unnamed Employees, Officers and Agents of
the City of Cleveland, Defendants-Appellants,
Cross-Appellees.
 Nos. 85-3927, 85-3959.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 27, 1987.
Decided Feb. 1, 1988.
Rehearing and Rehearing En Banc Denied April 12, 1988.
 
 Irving Berger (argued), Robert M. Wolff, Craig S. Cobb, Asst. Directors of Law, Cleveland, Ohio, for defendants-appellants, cross-appellees.
 Bruce C. Allen (argued), Allen & Hodgman, Cleveland, Ohio, for plaintiff-appellee, cross-appellant.
 Before KENNEDY, RYAN, and NORRIS, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 Before us are cross-appeals by the defendant City of Cleveland, and plaintiff Martha Molton, Administrator for the estate of William Molton. Cleveland appeals from a jury verdict in plaintiff's favor on state wrongful death and assault and battery actions, and a 42 U.S.C. Sec. 1983 deliberate indifference claim. Plaintiff appeals the district court's judgment notwithstanding the verdict (j.n.o.v.) in favor of defendant on a Sec. 1983 excessive use of force claim, and the lower court's refusal to grant prejudgment interest or a new trial on damages.
 
 I.
 
 2
 It is well to remember, as the facts of this case are related, that the only claims before us are against the City of Cleveland and not against any named individuals.
 
 
 3
 The City's version of the events that culminated in the tragic suicide of the plaintiff's decedent contrast sharply with the version presented by the plaintiff; but the jury returned a verdict for plaintiff, including interrogative verdicts, suggesting strongly that the jury disbelieved the City's account of the evidence and believed the version presented by plaintiff's witnesses. Therefore, in examining the evidence for sufficiency, we take the facts in a light most favorable to plaintiff. Cf. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).
 
 
 4
 Bill Molton was a recovering alcoholic. After leaving work on August 2, 1981, he accompanied some co-employees and friends to several local bars and became intoxicated. After leaving the last bar, Molton drove his van through a red light. Two Cleveland police officers, Juan Camacho and Kevin Cielec, ordered Molton to pull over to the side of the road. When he did, the officers demanded Molton's driver's license and registration. Molton slipped the papers through a slightly opened window. He was uncooperative and cursed at the officers, so they called for backup assistance. Officers Robert Haug and James Walsh came to the scene. The officers requested Molton to step out of the van. He refused. Officer Haug then forced open the side vent window, reached inside, and opened the door. As Haug reached in to unlock the door, Molton struck the officer's arm. The officers then forcibly removed Molton from the van. Immediately after Molton had been pulled from the van, one of the van's occupants, Charles Anderson, heard several loud crashes against the side of the vehicle. Shortly thereafter, the occupants stepped out of the van and saw Molton on the ground, doubled over, holding his ribs. When Anderson, who was living with Molton, attempted to get the keys to Molton's apartment so that he could go home, the officers said to him: "If you don't keep walking the same thing is going to happen to you."
 
 
 5
 The officers cuffed Molton's hands behind his back and drove him to the police station. Molton had to be dragged out of the car and into the police station because he resisted. When he was brought into the station booking area, there were three other prisoners present being booked on unrelated matters: Darren Roe, Kevin Roe, and Mark Shefcheck. None of the three knew Molton.
 
 
 6
 Molton continued to shout profanities at the officers, and refused to cooperate. At trial, Darren and Kevin Roe and Shefcheck testified that the officers threw Molton against a wall several times, smashing his face up against the glass window in the booking area. While Molton, who was still handcuffed, was pleading with the officers to leave him alone, one of the officers knocked Molton's feet from under him causing him to fall to the floor. Several more officers then rushed in from the office area and kicked and punched Molton repeatedly. Lisseth Keener,[1] the jailer, shouted "kick his ass!" and struck Molton with a flashlight. Throughout the beating, Molton had his hands cuffed behind his back.
 
 
 7
 At about that time Carlin Roe arrived at the public report counter of the precinct in order to post bail for his brothers Kevin and Darren. When Carlin heard the policemen beating Molton, he thought they were beating his brothers. He yelled to the officers to stop beating his brothers, whereupon he was arrested for disorderly conduct. The officers took Carlin into the booking area and, pointing to Molton, asked, "Is this your brother?"
 
 
 8
 Carlin Roe, now a prisoner himself, was booked and placed in a cell directly across from Molton. Molton told Carlin that "he couldn't stand the pain from the policemen beating him," and that he was going to hang himself. As Molton, using his shirt, was attempting to rig a noose in order to hang himself from the upper part of the cell, Carlin Roe began shouting loudly for help. Molton failed at his first effort to hang himself because his shirt tore; however, upon the second attempt he was successful and ended his life. Medical experts testified that it took several minutes for Molton to die from the hanging. Although Darren and Kevin Roe and Shefcheck heard the shouts for help from the booking area, no officer responded. Carlin shouted for some ten to fifteen minutes before one of the officers told Keener to "go see what he wants." Keener found Molton hanging from the cell bars, and the officers cut him down.
 
 
 9
 The administrator of Molton's estate sued the City, and the jury returned a verdict in favor of plaintiffs in the total amount of $78,200. The jury returned both a general verdict and a series of interrogative verdicts. It found the City liable on the Sec. 1983 claim for deliberate indifference to a strong likelihood that Molton would commit suicide, and on the state wrongful death claim based on the City's negligence. The jury allocated twenty percent of the causal negligence to Molton and eighty percent to the City of Cleveland. The jury also concluded that the officers exercised unconstitutionally excessive force in beating Molton, and found the City liable for the assault and battery of Molton. The jury awarded $10,000 for the assault and battery claim, $45,000 for the state wrongful death action, $20,000 for the Sec. 1983 deliberate indifference action, and $3,200.00 for the medical and funeral expenses. The district judge granted the City's motion for judgment notwithstanding the verdict on plaintiff's excessive use of force claim on the ground that plaintiff had failed to meet the "severity of injury" requirement.
 
 Defendant's Appeal
 II.
 
 10
 Under Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), a prison official's deliberate indifference to the serious medical needs of inmates amounts to cruel and unusual punishment, and violates the eighth amendment. To sustain such a claim, it is not necessary that the prison officials consciously sought to inflict pain by withholding treatment; it is sufficient to show deliberate indifference to an inmate's serious medical needs. Westlake v. Lucas, 537 F.2d 857, 860 n. 3 (6th Cir.1976). A pretrial detainee's constitutional rights under the eighth and fourteenth amendments are denied by deliberate indifference to his serious medical needs just as such indifference denies the corresponding rights of a convicted prisoner. Anderson v. City of Atlanta, 778 F.2d 678, 686-87 n. 12 (11th Cir.1985); Garcia v. Salt Lake County, 768 F.2d 303, 307 (10th Cir.1985).
 
 
 11
 Plaintiff's Sec. 1983 "deliberate indifference" claim is that a policy of the City of Cleveland caused the officers to be deliberately indifferent to the strong likelihood that Molton would commit suicide. There is some support for this theory of liability. See Partridge v. Two Unknown Police Officers of Houston, 791 F.2d 1182 (5th Cir.1986); Roberts v. City of Troy, 773 F.2d 720 (6th Cir.1985); State Bank of St. Charles v. Camic, 712 F.2d 1140, 1145 n. 3 (7th Cir.), cert. denied, 464 U.S. 995, 104 S.Ct. 491, 78 L.Ed.2d 686 (1983). In Roberts, 773 F.2d at 724-25, this court determined that in a Sec. 1983 action against a city for failing to prevent the suicide of a pretrial detainee, a plaintiff must prove deliberate indifference; and that deliberate indifference constitutes the purposeful punishment necessary for finding a fourteenth amendment violation. We specifically rejected the contention that such an action could be maintained on a theory of mere negligence. The conduct for which liability attaches must be more than negligence, Estelle v. Gamble, 429 U.S. at 105-06, 97 S.Ct. at 291-92, it must demonstrate deliberateness tantamount to an intent to punish.
 
 III.
 
 12
 The City attacks the jury's verdict in favor of plaintiff on the deliberate indifference claim on a number of grounds. We consider only one of them, however, because we conclude therefrom that we must set aside the jury's verdict because plaintiff introduced no evidence proving the City had a custom or policy which caused the officers to be deliberately indifferent to Molton's serious medical needs.
 
 
 13
 Cleveland cannot be held vicariously liable under Sec. 1983 for damages inflicted by its officers. Rather, the municipality may be required to respond in damages under Sec. 1983 only for its own actions. Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); Oklahoma City v. Tuttle, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In Monell, the Court stated that:
 
 
 14
 [T]he touchstone of the Sec. 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution....
 
 
 15
 436 U.S. at 690, 98 S.Ct. at 2036. The Court concluded that:
 
 
 16
 [A] local government may not be sued under Sec. 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under Sec. 1983.
 
 
 17
 Id. at 694, 98 S.Ct. at 2037-38. In Monell the city was held liable because it expressly adopted a sick leave policy that discriminated against pregnant women. This expressly adopted policy was "unquestionably ... the moving force of the constitutional violation...." Id. Although the Monell Court did not explore the full contours of municipal liability under Sec. 1983, it did state that the city could be held liable either for an expressly adopted policy or for a well-settled "custom."
 
 
 18
 In Oklahoma City v. Tuttle, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), plaintiff brought a Sec. 1983 claim against Oklahoma City after an officer shot and killed plaintiff's decedent. The trial court instructed the jury as follows:
 
 
 19
 [A] single, unusually excessive use of force may be sufficiently out of the ordinary to warrant an inference that it was attributable to inadequate training or supervision amounting to 'deliberate indifference' or 'gross negligence' on the part of the officials in charge....
 
 
 20
 Id. at 813, 105 S.Ct. at 2431. A majority of the Court joined part I of Justice Rehnquist's opinion, for reversal, because the jury instruction allowed a finding of liability against the city based on a single act by an officer, without proof of an affirmative link between that act and a city custom or policy. A plurality joined part III of Justice Rehnquist's opinion which further attacked the inference permitted by the trial court's instruction.
 
 
 21
 But more importantly, the inference allows a Sec. 1983 plaintiff to establish municipal liability without submitting proof of a single action taken by a municipal policy maker....
 
 
 22
 * * *
 
 
 23
 * * *
 
 
 24
 Here ... the "policy" that respondent seeks to rely upon is far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell.... In the first place, the word "policy" generally implies a course of action consciously chosen from among various alternatives; it is therefore difficult in one sense even to accept the submission that someone pursues a "policy" of "inadequate training," unless evidence be adduced which proves that the inadequacies resulted from conscious choice--that is, proof that the policymakers deliberately chose a training program which would prove inadequate. And in the second place, some limitation must be placed on establishing municipal liability through policies that are not themselves unconstitutional, or the test set out in Monell will become a dead letter.... Monell must be taken to require proof of a city policy different in kind from this latter example before a claim can be sent to a jury on the theory that a particular violation was "caused" by the municipal "policy." At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged.
 
 
 25
 Id. at 821-23, 105 S.Ct. at 2435-36 (footnote omitted).
 
 
 26
 In Rymer v. Davis, 775 F.2d 756 (6th Cir.1985), cert. denied, --- U.S. ----, 107 S.Ct. 1369, 94 L.Ed.2d 685 (1987) (on remand for reconsideration in light of Tuttle, sub nom. City of Sheperdsville v. Rymer, 473 U.S. 901, 105 S.Ct. 3518, 87 L.Ed.2d 646 (1985)), this court determined that, although a municipality could not be held liable for a single act by a single officer unconnected to a policy or custom of the city, the city could be held liable for inadequate training or supervision of its police force if that inadequate training or supervision amounted to deliberate indifference or gross negligence on the part of the officials in charge. Evidently, this court declined to adopt Justice Rehnquist's plurality view which was skeptical of finding a "policy" of "inadequate training."
 
 
 27
 Subsequently, in Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Supreme Court addressed the subject of government liability for a single action taken in execution of a governmental policy. The case report summary adequately describes the relevant facts:
 
 
 28
 A physician who operated a medical clinic was indicted by a grand jury for fraudulently accepting welfare payments. When two of his employees were subpoenaed as witnesses, but failed to appear before the grand jury, capiases were obtained to compel the appearance of the subpoenaed witnesses, and county deputy sheriffs attempted to serve the capiases at the physician's clinic. The physician refused to let the deputies enter, and after being informed of the situation by the deputies, an assistant county prosecutor conferred with the county prosecutor, who told the assistant prosecutor to instruct the deputy sheriffs "to go in and get" the witnesses. The assistant prosecutor passed these instructions along to the deputies, who entered the clinic after city police officers, who had also been advised of these instructions, chopped down the door with an axe. The physician filed a civil rights action for damages against the county and other defendants, under 42 USCA Sec. 1983, in the United States District Court for the Southern District of Ohio, alleging violations of his rights under the Fourth and Fourteenth Amendments of the Federal Constitution. The District Court dismissed the complaint. On appeal, the United States Court of Appeals for the Sixth Circuit upheld the dismissal of the claims against the county (746 F2d 337).
 
 
 29
 Pembaur, 89 L.Ed.2d at 452.
 
 
 30
 In a fragmented decision comprising five opinions, the Supreme Court determined that the county could be held liable under Sec. 1983. A majority of six justices determined: 1) that the county prosecutor's instruction to the deputy sheriff to use force to enter the premises resulted in action taken pursuant to county policy because the prosecutor was a person authorized to establish policy with respect to the action in question; and 2) that municipal liability may be imposed for action taken pursuant to a single decision by a municipal policymaker. A slightly smaller majority of five justices (Justice O'Connor withdrawing from the initial majority of six) held that the county was subject to liability on the additional ground that the prosecutor was the final decision-maker for the county in regards to serving a capias, and therefore the county was acting through the prosecutor.[2]
 
 
 31
 Given the multiple opinions of the Supreme Court, it is less than clear, to say the least, what standard this court should use in determining whether Cleveland had a municipal policy which resulted in Molton's suicide and thus can be the basis for Sec. 1983 liability against the City.
 
 
 32
 Plaintiff identifies the following as "inherently matters of city policy" demonstrating the City's deliberate indifference to the strong likelihood that Molton would take his own life: (1) operation of a jail with a remote cell block; (2) failure to develop and use health screening forms; (3) permitting Lisseth Keaner, a rookie officer, to supervise the jail facility; (4) inadequately training its officers in the prevention of jail suicides; (5) failure to install an audio communication system between the cell block and the office area; (6) failure to modify cell architecture to render suicide less likely; and (7) failure to take corrective measures after eight prior suicides had occurred in the jail facility.
 
 
 33
 There are essentially two problems with plaintiff's argument. First, plaintiff never adduced evidence of a definitive City policy, custom, or usage which was an affirmative link, the moving force that animated the behavior--the acts of commission or omission--of the police officers that resulted in the constitutional violations alleged. The Supreme Court authorities, specifically Tuttle and Pembaur, require proof of a deliberate and discernible city policy to maintain an inadequately trained police department, or nonsuicide-proof, inadequately designed and equipped jails; not mere speculation that such matters are "inherently matters of city policy." A second problem with plaintiff's theory is that the policies she identifies describe mere negligence. The City's failure to build a suicide-proof jail cell, and its inadequate training of its police force, may well be acts of negligent omission, but they have not been shown to be the result of municipal policy: "a deliberate choice to follow a course of action ... made from among various alternatives by the official or officials responsible for establishing formal policy with respect to the subject matter in question." Pembaur, 475 U.S. at 483, 106 S.Ct. at 1300, 89 L.Ed.2d at 465.
 
 
 34
 The City did adopt a policy. Attempting to deal with the problem of jail suicides, of which there had been eight at this precinct since 1970, the City adopted GPO 34-80 which directs officers to remove the belts from all prisoners or detainees before they are placed in cells, and to provide extra surveillance whenever a person is: (a) extremely despondent; (b) threatens self-destruction; or (c) gives any other reason to believe that he may attempt suicide. Plaintiff submitted evidence that GPO 34-80 was inadequate, and argues here that better training of the City's officers and better jail facilities would have prevented Molton's death.
 
 
 35
 Even if we were to conclude, as a number of circuits have, that the requisite policy, custom, or usage necessary to establish Sec. 1983 liability in a municipality may arise from gross negligence or recklessness amounting to deliberate indifference, the plaintiff in this case cannot succeed because her proofs show, at most, mere negligence by the City in failing to take adequate preventive measures to prevent jail suicides and to train its police officers adequately. See, e.g., Fiacco v. City of Rensselaer, 783 F.2d 319, 326 (2d Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987) ("deliberate indifference"); Languirand v. Hayden, 717 F.2d 220, 227 (5th Cir.1983), cert. denied, 467 U.S. 1215, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984) (so grossly negligent as to constitute "deliberate indifference"); Patzner v. Burkett, 779 F.2d 1363, 1367 (8th Cir.1985) ("deliberate indifference" where training so grossly negligent "that police misconduct inevitably occurs"); Wellington v. Daniels, 717 F.2d 932, 937 n. 6 (4th Cir.1983) (no showing that municipality "remain[ed] indifferent to" unwarranted injury); Voutour v. Vitale, 761 F.2d 812, 820 (1st Cir.1985). The evidence in this case does not amount to proof of gross negligence or recklessness amounting to deliberate indifference. There has been no showing that City policy makers, as distinguished from the individual police officers who participated in Molton's arrest and booking either ignored a known or apparent risk, or consciously disregarded or were deliberately indifferent to the safety of prisoners. On the contrary, the proofs regarding GPO 34-80 show that the City undertook an initiative to prevent future jail suicides, but may have done so negligently. Negligence does not establish a Sec. 1983 claim. Estelle, 429 U.S. at 105-06, 97 S.Ct. at 291-92; Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); Roberts v. City of Troy, 773 F.2d 720 (6th Cir.1985).
 
 
 36
 In sum, plaintiff did not establish the existence of a City policy of gross neglect, recklessness, or deliberate indifference to the danger of Molton's suicide, sufficient to sustain the jury's Sec. 1983 verdict. See also Barnier v. Szentmiklosi, 810 F.2d 594, 599 (6th Cir.1987).
 
 IV.
 
 37
 * Although we are required to find in the City's favor on the Sec. 1983 claim, we conclude that the City's appeal from the jury's verdict on the pendent state claims is meritless. Ohio law establishes a duty on the part of jailers to exercise reasonable care for the health and safety of prisoners committed to their custody, and to guard against dangers which were known or which should have been known to the jailers. See Jenkins v. Krieger, 67 Ohio St.2d 314, 423 N.E.2d 856 (1981), cert. denied, 454 U.S. 1124, 102 S.Ct. 973, 71 L.Ed.2d 111 (1981), and Clemets v. Heston, 20 Ohio App.3d 132, 485 N.E.2d 287 (1985), as codified at Ohio Rev.Code Ann. Sec. 341.01 (1986 Supp.). The evidence amply supports the jury's determination that the City failed to meet that standard of care.
 
 
 38
 In Jenkins, the jail cell "contained no device by which help might be summoned in an emergency," and the officers failed to search decedent and discover he was carrying matches. The matches caused a fire to start in the inmate's mattress while he was sleeping. The Ohio Supreme Court affirmed the appellate court's reversal of a judgment notwithstanding the verdict in favor of defendant because the failure to discover the matches, and the fact that the deceased would have lived if he had received prompt attention, were sufficient evidence of negligence to support the jury's verdict. In Clemets, application of the standard of care announced in Jenkins precluded municipal liability because the decedent had left the custody of the police before he committed suicide. After the police allowed the decedent to leave, he went to his truck and shot himself in the head with a shotgun. The Ohio Court of Appeals held that the jailers were not liable because their special duty to exercise reasonable care for the health and safety of their prisoner extended to the decedent only while he was in their custody.
 
 
 39
 Under Jenkins and Clemets, the police have a duty to protect the health and well-being of those in their custody against known or foreseeable dangers. Violation of this duty results in liability for negligence. In this case, the jury found the City negligently failed to perform its duty of care for Molton's health and well-being by failing to take the necessary measures to prevent his death by suicide. The jury's verdict was supported by abundant evidence. The officers testified they were never trained in suicide prevention. The state jail inspector, Melda Turker, testified concerning the Ohio minimum requirements for jail facilities. Although Turker was not allowed to testify that the City had failed to meet these requirements, the court allowed the jury to visit the facilities and to determine whether the requirements had been met. See also Ohio Rev.Code Ann. Sec. 5120.10 (1986 Supp.). Turker and Dr. Danto, plaintiff's expert, testified that the City's attention to the safety and health of its prisoners and detainees was inadequate in a number of ways to prevent suicide. The jury's determination that the City breached its duty of care under Ohio law is well-supported by the evidence.
 
 
 40
 Nonetheless, the City argues that Molton's suicide was an independent intervening cause of his death as a matter of law. For this proposition, the City cites several cases in which liability was premised on a decedent's exaggerated reaction to unrelated tortious conduct. In such cases, a victim's suicide is beyond the scope of the risk created by the original tortious conduct, and no liability accrues. This is not such a case. The City was under a special duty, which arose from the City's duty to protect the health and welfare of its prisoners and detainees.
 
 
 41
 In Taylor v. Webster, 12 Ohio St.2d 53, 56, 231 N.E.2d 870 (1967), the Ohio Supreme Court announced:
 
 
 42
 A rule of general acceptance is that, where the original negligence of the defendant is followed by the independent act of a third person which directly results in injurious consequences to plaintiff, defendant's earlier negligence may be found to be a proximate cause ... if ... defendant could reasonably have foreseen that the intervening act was likely to happen.
 
 
 43
 As Ohio Fair Plan Underwriting Association v. Arcara, 65 Ohio App.2d 169, 417 N.E.2d 115 (1979), explained:
 
 
 44
 In other words, the question is whether the intervening cause and resulting damage were reasonably foreseeable by the one who was guilty of negligence.
 
 
 45
 Id. at 175, 417 N.E.2d 115. Molton's suicide was well within the scope of the risk and was therefore foreseeable. The suicide was not, therefore, an independent intervening cause.
 
 B
 
 46
 The City next argues that as a matter of law, Molton's contributory negligence barred any recovery for his suicide under the Ohio Comparative Negligence Act, Ohio Rev.Code Ann. Sec. 2315.19 (1981). The statute provides that if a plaintiff's injury is caused more than fifty percent by his own acts, his contributory fault bars his recovery as a matter of law. The City contends that no rational jury could consider Molton's suicide to be a less than fifty percent cause of his death.
 
 
 47
 The City requested, and received, an instruction to the jury on comparative negligence. The jury determined that the City's negligence was eighty percent responsible for Molton's death, while Molton's negligence was only twenty percent responsible. It was justified in concluding that the City was negligent in failing to adequately train its officers: 1) to avoid beating an intoxicated and handcuffed prisoner in their care, 2) to respond to signals that a pretrial detainee was a suicide risk, and 3) to respond to Carlin Roe's calls for help while Molton was hanging himself. The jury was also justified in concluding that the City negligently failed to design, equip, and staff the jail to permit better surveillance of prisoners and thus to render less likely this ninth suicide at that facility in twelve years. Similarly, it was justified in finding those acts and omissions were a proximate cause of Molton's death of comparatively greater degree than Molton's negligence.
 
 
 48
 In sum, the jury's decision that the City was eighty percent responsible while Molton was only twenty percent responsible has support in the record and will not be disturbed on appeal.
 
 V.
 
 49
 * We also find the City's challenge to the pendent state assault and battery claim to be meritless. The City contends that the jury's verdict on the assault and battery claim cannot be reconciled with the physical evidence. The physical evidence consisted of various photographs of Molton's body which did not show injuries as serious as the City argues would have been caused by a beating of the kind plaintiff's witnesses described.
 
 
 50
 The photographs showed some abrasions on Molton's body, and some bruises on the right eye and both wrists. Photographs also showed blood running from his nose down along his cheeks. The City argues that, of necessity, more bruises would have appeared in the photos had Molton been beaten to the extent described by plaintiff's witnesses. However, expert testimony maintained that bruises form over time and cease forming at the time of death. The medical witnesses testified that had Molton lived, more bruises might have formed. Furthermore, expert witnesses testified that simply because Molton had been beaten did not mean that bruises would appear wherever he had been struck. For a bruise to have formed, the blows must have been of sufficient strength to have broken blood vessels. Thus, blows could have been struck which simply did not cause bruises. In all, the medical evidence and the testimony of the expert witnesses included some inferences that favored defendant, but were not dispositive. It was the jury's task to weigh the evidence. The individuals who testified to the beating were witnesses who had never met Molton before. The jury's verdict is sufficiently supported.
 
 B
 
 51
 The City next contests the jury's finding that the officers' tortious conduct was calculated to facilitate or promote the City's business and argues that if this finding is unsupported, the City cannot be held vicariously liable. The claim is meritless.
 
 
 52
 The City can be held liable for police misconduct under respondeat superior, in the same manner as a private corporation. Longfellow v. City of Newark, 18 Ohio St.3d 144, 480 N.E.2d 432 (1985); Enghauser Mfg. Co. v. Eriksson Engineering Ltd., 6 Ohio St.3d 31, 451 N.E.2d 228 (1983). Contrary to the City's position:
 
 
 53
 A master is subject to liability for the intended tortious harm by a servant to the person or things of another by an act done in connection with the servant's employment, although the act was unauthorized, if the act was not unexpectable in view of the duties of the servant.
 
 
 54
 Restatement (2d) of Agency Sec. 245 (1958). See also Wiebold Studio, Inc. v. Old World Restorations, Inc., 19 Ohio App.3d 246, 250-51, 484 N.E.2d 280 (1985). The actions of the officers were "not unexpectable" given their duties as police officers.
 
 VI.
 
 55
 The City asks that the jury award be reduced by twenty percent due to the contributory fault of Molton. We agree that the wrongful death award of $45,000 must be reduced by twenty percent due to Molton's comparative negligence. But, the award based on the intentional tort cannot be so reduced. See Ohio Rev.Code Ann. Sec. 2315.19 (1981); see also Kellerman v. J.S. Durig Co., 176 Ohio St. 320, 199 N.E.2d 562 (1964).
 
 Plaintiff's Cross-Appeal
 VII.
 
 56
 The jury found the City liable to plaintiff, under Sec. 1983, for an excessive use of force. The district court granted defendant a judgment notwithstanding the verdict on that claim. The excessive use of force claim focused on two issues: (1) whether unconstitutionally excessive force was used, an issue which was to be resolved in the first phase of the trial, and (2) whether the use of excessive force was a result of City policy or custom. Under the district court's pretrial order, this second issue was to be reached by the jury in the second phase of the trial only if it found for plaintiff on the first issue. The jury never reached the second question because the trial court determined in its ruling on the j.n.o.v. motion, after the trial's first phase, that there was no use of excessive force. The City defends the court's decision to grant it j.n.o.v. on the grounds that the witnesses who testified to the beating were unreliable and that, therefore, there was no proof excessive force was used. However, the district court's decision to grant j.n.o.v. was not based on the credibility of the witnesses, as seen by the fact the assault and battery verdict was upheld by the district court. Rather, the district court apparently granted j.n.o.v. because it felt that Shillingford v. Holmes, 634 F.2d 263 (5th Cir.1981), mandated proof of a "severe injury."
 
 
 57
 The evidence showed that Molton was intoxicated, had his hands cuffed behind his back, was knocked to the ground, and, while lying there, was struck and kicked by police officers in the police station. The jury found the force used to be excessive and was entirely justified in doing so. Finally, this court, in Lewis v. Downs, 774 F.2d 711, 714 (6th Cir.1985), determined that conduct such as occurred in this case was an unlawfully excessive use of force. This court also concluded that "we do not believe that a serious or permanent injury is a prerequisite to a claim under Section 1983." Id. We conclude the district court erred in granting the j.n.o.v. and that the jury verdict must be reinstated. See also Norris v. District of Columbia, 737 F.2d 1148 (D.C.Cir.1984). On remand, the district court must address the issue of whether a city policy, custom or usage caused the constitutional violation.
 
 VIII.
 
 58
 After trial, the court denied plaintiff's motion for prejudgment interest.
 
 
 59
 Prejudgment interest is available on a state claim through Ohio Rev.Code Sec. 1343.03(C), and whether it is awarded is addressed to the discretion of the district court. Bass v. Cleveland Clinic Found., No. 51730 (Ohio App.1987).
 
 
 60
 Generally, prejudgment interest is not permitted under Ohio law where the claim is unliquidated--where damages were not readily ascertainable prior to trial. Coal Resources, Inc. v. Gulf & Western Indus., 756 F.2d 443, 451 (6th Cir.1985). This is such a case. There was no error in denying the prejudgment interest. We affirm.
 
 IX.
 
 61
 Last, plaintiff seeks a new trial on the issue of damages, claiming the evidence supported a larger damage award than was returned by the jury. Plaintiff argues that the $45,000 verdict for wrongful death was grossly inadequate and should be set aside. Because the verdict was within the universe of possible awards, and was supported by the evidence, the jury's verdict must stand. Miles v. Vicksburg Chemical Co., 588 F.2d 512, 517 (5th Cir.1979). See also Vanskike v. Union Pacific Railroad Co., 725 F.2d 1146 (8th Cir.1984); Kazan v. Wolinski, 721 F.2d 911 (3d Cir.1983); Jones v. Wittenberg University, 534 F.2d 1203 (6th Cir.1976).
 
 
 62
 Plaintiff also argues that Molton's brother, Wilbur Molton, should have been included as a beneficiary, and that the award for wrongful death should therefore be increased to compensate him as a "next of kin." Ohio Rev.Code Ann. Sec. 2125.02 (1986 Supp.) provides, in part:
 
 
 63
 (A)(1) An action for wrongful death shall be brought in the name of the personal representative of the decedent for the exclusive benefit of the surviving spouse, the children, and the parents of the decedent, ... and for the exclusive benefit of the other next of kin of the decedent....
 
 
 64
 * * *
 
 
 65
 * * *
 
 
 66
 (B) Compensatory damages may be awarded in an action for wrongful death and may include damages for the following:
 
 
 67
 * * *
 
 
 68
 * * *
 
 
 69
 (3) Loss of the society of the decedent, including loss of companionship ... suffered by the surviving spouse, minor children, parents, or next of kin....
 
 
 70
 Plaintiff argues that the "or next of kin" language includes Molton's brother as a beneficiary under the wrongful death claim and that the district court erred in excluding the brother from the case as a beneficiary. We disagree. J. McCormick, Wrongful Death in Ohio, Sec. 3.05 at 19 (1982), and Bennett v. City of Cleveland, No. 50479 (Ohio App.1986), interpret the "or next of kin" language to permit the next of kin to collect for loss of society of the decedent only where there is no surviving spouse, minor children, or parents. That is not the case here. Further, this court gives substantial deference to the district court's interpretation of state law, absent state authority on the subject. Martin v. Joseph Harris Co., 767 F.2d 296, 299 (6th Cir.1985). The district court did not err in its interpretation of the statute.
 
 X.
 
 71
 We REVERSE the district court's denial of j.n.o.v. in defendant's favor on the Sec. 1983 "deliberate indifference" claim. We REVERSE the district court's grant of j.n.o.v. in defendant's favor on the Sec. 1983 "excessive use of force" claim. We REMAND for a reduction of the wrongful death award to reflect the jury's verdict, for a determination of the City's liability on the Sec. 1983 excessive use of force claim, and for such proceedings as are not inconsistent with this opinion. We AFFIRM the judgment of the district court in all other respects.
 
 
 
 [1]
 At the time of the incident Keener's name was Lisseth Cardona; however, throughout the trial all parties referred to her as Keener--we will do likewise
 
 
 [2]
 The remainder of Justice Brennan's lead opinion, joined by Justices White, Marshall and Blackmun, was a plurality view that
 like other governmental entities, municipalities often spread policymaking authority among various officers and official bodies. As a result, particular officers may have authority to establish binding county policy respecting particular matters and to adjust that policy for the county in changing circumstances.
 Id. at 483, 106 S.Ct. at 1300, 89 L.Ed.2d at 465. This language would most liberally allow a finding of policy having been made in the act of a single municipal employee, depending on that employee's duties. Justice Stevens felt this lattermost portion of Brennan's opinion was merely advisory and not necessary to explain the Court's decision. Id. at 491 n. 6, 106 S.Ct. at 1304 n. 6, 89 L.Ed.2d at 470 n. 6, referring to Monell, 436 U.S. at 714, 98 S.Ct. at 2047 (Stevens, J., concurring in part). Justice O'Connor refused to join the latter section of the plurality opinion, stating: "I believe that the reasoning of the majority goes beyond that necessary to decide the case, and ... I fear that the standard the majority articulates may be misread to expose municipalities to liability beyond that envisioned by the Court in Monell...." Id. 475 U.S. at 491, 106 S.Ct. at 1304, 96 L.Ed.2d at 470. The remainder of the justices dissented. Justice Powell, joined by Chief Justice Burger and Justice Rehnquist, felt the short telephone order of the prosecutor could not constitute city policy.