CALLAHAN, Circuit Judge,
with whom BE A and IKUTA, Circuit Judges join, dissenting in part:
I agree that the judgment against the individual defendants should be affirmed,[1] but I dissent from the affirmance of the judgment against the entity defendants. I agree with the majority’s conceptual approach: we must first determine whether the entity defendants had a policy or custom that caused Castro’s injury, and second determine whether the policy or custom reflected deliberate indifference. Maj. Op. at 1074-75. However, the majority understates what is necessary to show a policy related to Castro and uses “smoke and mirrors” to find deliberate indifference. Regardless of what evidence Castro might have, could have, or should have produced at trial, the record in this case — even construed in the light most favorable to Castro — permits only one conclusion: the County of Los Angeles did not have a policy or custom that reflected deliberate indifference and caused. Castro’s injury.
I. The Legal Standard for Monell Liability
The Supreme Court has been fairly consistent in explaining the basis for Monell liability. In Pembaur v. City of Cincinnati, the Court held “municipal liability under § 1983 attaches where — and only where — a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.” 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).
In City of Canton, Ohio v. Harris, the Court addressed “whether a municipality’s failure to train employees can ever be a basis for § 1983 liability.” 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). It held “that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact,” and the policy was “the moving force [behind] the constitutional violation.” Id. (internal quotation marks omitted). The Court emphasized that “the need for more or different training [must be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.” Id. at 390, 109 S.Ct. 1197.
In Board of County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 404-05, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), the Court explained:
As our § 1983 municipal liability jurisprudence illustrates, however, it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the “moving force” behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must *1079 demonstrate a direct causal link between the municipal action and the deprivation of federal rights.
More recently, in Connick v. Thompson, the Supreme Court reiterated that deliberate indifference “is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.” 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011) (quoting Brown, 520 U.S. at 410, 117 S.Ct. 1382). The Court explained, “[a] less stringent standard of fault for a failure-to-train claim ‘would result in de facto respondeat superior liability on municipalities.’ ” Id. (quoting City of Canton, 489 U.S. at 392, 109 S.Ct. 1197).
Accordingly, even accepting that an “objective” standard applies to the inquiry into the propriety of a municipality’s actions, Monell liability requires first, a showing of “a deliberate choice to follow a course of action ... from among various alternatives.” Pembaur, 475 U.S. at 483, 106 S.Ct. 1292. Second, where Monell liability is based on the municipality’s failure to act or to train its employees, there must be a showing of deliberate indifference: “proof that a municipal actor disregarded a known or obvious consequence of his action.” Brown, 520 U.S. at 410, 117 S.Ct. 1382. Third, there must be a “a direct causal link between the municipal action and the deprivation of federal rights.” Id. at 404, 117 S.Ct. 1382.
II. The record does not support a finding of a deliberate choice sufficient to support Monell liability
1. Castro presented insufficient evidence to support a finding that the West Hollywood station’s sobering cell was unsafe.
The majority asserts that when Castro was assaulted in 2009, the applicable building codes required maximum visual supervision and that sobering cells contain an audio-monitoring system. Maj. Op. at 1065. But the record in this case does not support this conclusion.
No evidence was introduced at trial that federal or state law required video monitoring of a sobering cell. No County Code provisions or relevant California statutes were introduced at trial. Moreover, it appears that the California Building Code, tit. 24, § 1231.2.22 (2007), which the majority cites, did not say anything about sobering cells. Coverage of sobering cells was added to that section when the code was updated in 2010, after Castro had been assaulted. Cal. Building Code tit. 24 § 1231.2.22(2010).
Instead, the majority relies on the County Board of Supervisors’ adoption “through legislative action” of provisions of the California Building Code that the majority characterizes as “aimed at mitigating the risk of serious injury to individuals housed in sobering cells.” See Maj. Op. at 1065, 1077. But the County Code provision adopting the provisions of the California Building Code was not placed in evidence in the district court. As this material was not before the jury, the jury could not have relied upon it to find a policy or custom.
Furthermore, the majority’s characterization of the “legislative action” is hardly fair. In 2007, the County adopted by reference and incorporated into its code several chapters of the California Building Code. Within the over 1,300 pages adopted are provisions calling for maximum visual supervision and audio-monitoring of sobering cells. Cal. Bldg. Code tit. 24 §§ 1231.2.4, 1231.2.22. But this did not give rise to the constructive knowledge alleged by the majority because the California Building Code has a “grandfather” clause. It provides that “[tjhese requirements shall not be applicable to facilities which were constructed *1080 in conformance with the standards of the Corrections Standard Authority in effect at the time of initial architectural planning.” Cal. Code Regs. Title 24, § 13-102(6) (2008). Indeed, we previously recognized the import of this clause in Blackwell v. City & County of San Francisco, 506 Fed.Appx. 585, 587 (9th Cir. 2013) (unpublished) (citing the statement in Californians for Disability Rights v. Mervyn’s LLC, 165 Cal.App.4th 571, 81 Cal.Rptr.3d 144 (2008), that Title 24 “does not require facilities that predate its enactment to comply with its regulations unless and until the facility is altered”). In addition, the existence of the grandfather clause indicates that the new audio and visual monitoring standards in the California Building Code were not essential for the safety of detainees. Thus, the County’s adoption of 1,300 pages of the California Building Code in 2007, could not have alerted the County to the alleged risk of being housed in the West Hollywood station’s sobering cell.
At the end of its opinion, the majority attempts to downplay the importance of the grandfather clause by arguing that a provision in the West Hollywood manual does not contain a grandfather clause. Maj. Op. at 1077. This is true, but the document is not sufficient to support Monell liability. While the cited first paragraph of the West Hollywood station’s manual generally defines a sobering cell and requires “maximum visual supervision of prisoners by staff,” the second paragraph states:
Most station sobering cells (built prior to current State standards) have a hard floor, standard toilet, wash basin, drinking fountain, and a solid raised ledge or bench. Unless, otherwise exempted by the State Board of Corrections, these sobering cells are out of compliance with current standards and should not be utilized.
Notably, the inadequacy of visual inspection is not listed as an example of noncompliance excluding the use of a sobering cell. Moreover, this provision presumably precluded the use of the West Hollywood sobering cell by anyone at any time. It does not appear that the general propriety of using the West Hollywood station’s sobering cell was raised or considered in the trial court.[2]
Furthermore, Castro offered no evidence as to whether the sobering cell met that applicable standards when it was built or those in effect in 2007. He was offered an opportunity to present evidence of prior incidents at the West Hollywood station, but declined to do so. Indeed, it appears that Castro’s choice to focus on the officers’ deliberate indifference was both strategic and successful. An argument that the structure of the West Hollywood police station was even partially responsible for Castro’s injuries might have, in the eyes of the jury, reduced the level of the individual officers’ culpability.
The record in this case does not support an inference that any provision in the station manual or the adoption of various chapters of the California Building Code somehow established that the West Hollywood station’s sobering cell presented a known or obvious danger.
2. There is insufficient evidence to support a finding of a custom or policy.
The majority proceeds to offer a hodgepodge of rationales in an attempt to discern a deliberate choice or policy. First, *1081 implicitly acknowledging the lack of evidence concerning the propriety of the design of the sobering cell, the majority disclaims that the design of the cell is a policy, custom, or practice, asserting that “the design of the cell is only the backdrop.”[3] Maj. Op. at 1075. Second, the majority asserts that “in light of the poor design and location of the sobering cell ... there was a custom of housing intoxicated inmates in sobering cells that contained inadequate audio monitoring.” Maj. Op. at 1075. Third, it asserts that there were “other cells in which to detain intoxicated prisoners.” Maj. Op. at 1075. Fourth, the majority criticizes the “half-hour checks by the jailer.” Maj. Op. at 1075. The majority then cobbles these assertions together and proclaims that they constitute a custom or policy “to use a sobering cell that lacked adequate audio surveillance to detain more than one belligerent drunk person while checking the cell visually only once every half hour.” Maj. Op. at 1075.
This conclusion is illusory. First, it'depends on a “policy” which does not exist. There is no policy “to place more than one belligerent drunk” in one cell. Rather, there was an explicit written policy forbidding the placement of more than one person in the detoxication cell. A deputy testified that when it became absolutely necessary to place a second person in the detoxication cell, they would take the less belligerent individual over to the Beverly Hills station and use its sobering cell. Indeed, the majority itself affirms that the individual defendants knew that Castro “was too intoxicated to care for himself; they knew that Gonzalez, a felony arres-tee, was enraged and combative; they knew or should have known that the jail’s 'policies forbade placing the two in the same cell in those circumstances; and they knew or should have known that other options for placing them in separate cells existed.” Maj. Op. at 1073 (emphasis added).
Second, the majority’s “the whole is greater than the sum of its parts” argument is not persuasive. Neither the individual parts nor their accumulation amount to a deliberate choice among various alternatives. The statement that there “was a custom of housing intoxicated inmates in sobering cells that contained inadequate audio monitoring” simply restates the majority’s factually unsupported conclusion that inadequate audio monitoring at the West Hollywood station violated Castro’s constitutional rights. That there were other cells available makes it clear that the officers should have followed the County’s policy against placing a second person in the sobering cell. Also, the majority’s denigration of the half-hour checks lacks any evidentiary basis. There is nothing in the record to suggest this policy was unreasonable or reflected deliberate indifference to the constitutional rights of detainees. Indeed, there was testimony that the half-hour checks were mandated by both state and department rules.
The record in this case includes no evidence that anyone in the County had considered, prior to this litigation, whether the new California Building Codes, with its grandfather clause, applied, or might have applied, to the West Hollywood police station. While there was evidence of the station’s physical layout, there was no evi *1082 dence that the spacing had caused any prior problems.[4] Rather than reflect deliberate indifference, the “choices” the majority manufactures from a sparse record appear to be independent factors that by chance coincided to Castro’s detriment, primarily because the individual officers failed to house Castro separately as required by the County’s policy.
Of course, a custom or policy may have more than one component and may be contrary to a written policy. See Maj. Op. at 1075-76, nn. 9-10. However, here, Castro failed to present a factual basis that can support a finding of deliberate indifference.[5]
III. There is no evidence of deliberate indifference
The majority quotes from the Supreme Court’s opinion in City of Canton to support the position that constructive notice may be sufficient to establish the deliberate indifference required for Monell liability. Maj. Op. at 1076 (quoting City of Canton, 489 U.S. at 396, 109 S.Ct. 1197). But, as noted, the Supreme Court further explained that “the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come in contact.” Id. at 388, 109 S.Ct. 1197 (emphasis added). In. Connick the Supreme Court reiterated that deliberate indifference requires “proof that a municipal actor disregarded a known or obvious consequence of his action.” 563 U.S. at 61, 131 S.Ct. 1350 (quoting Brown, 520 U.S. at 410, 117 S.Ct. 1382). In City of Canton, the Court explained that “the need for more or different training [must be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.” 489 U.S. at 390, 109 S.Ct. 1197 (emphasis added). Justice Brennan, in his concurring opinion, noted that only where “a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens” are the dictates of Monell satisfied. 489 U.S. at 396, 109 S.Ct. 1197 (Brennan, J., concurring).
Here, there was no “known or obvious consequence,” there was nothing “so obvious” or “so likely to result in the violation of constitutional rights” as to support a determination of deliberate indifference, *1083 and there was no substantial certainty. Castro was attacked by Gonzalez who, pursuant to the County’s express policy, should not have been placed in the cell occupied by Castro. There is nothing to suggest that the County should have anticipated violations of its policy. Moreover, the majority observes that the jury found that the individual officers “knew or should have known that the jail’s policies forbade placing the two together in the same cell in those circumstances.” Maj. Op. at 1073.
Fairly viewed, the record is devoid of evidence that the County “disregarded a known or obvious consequence,” Connick, 563 U.S. at 61, 131 S.Ct. 1350, and there is neither the obviousness nor the likelihood of a violation of a constitutional right necessary to support a finding of deliberate indifference. See City of Canton, 489 U.S. at 390, 109 S.Ct. 1197.
IV. There is no direct causal link between the County’s conduct and Castro’s injuries
The majority’s need to cobble together different “choices” in order to construct a policy of deliberate indifference also reflects the fact that there is no direct causal link between the policy perceived by the majority and Castro’s injury. Castro was injured by Gonzalez, a violent detainee who was placed in the sobering cell with Castro in direct contravention of the County’s clear policy against such placement. Moreover, Castro’s injuries resulted from, or were aggravated by, his jailer’s reckless disregard. The majority itself notes:
Solomon failed to respond to Castro’s banging on the window in the door of the cell. Jail video of the hallway showed Castro pounding on his cell door for a full minute, while Solomon remained unresponsive, seated at a desk nearby. Solomon failed to respond fast enough to Gonzalez’s inappropriate touching of Castro.
Maj. Op. at 1073. Indeed, the jury determined that the individual defendants were liable for punitive damages because they had “act[ed] with malice, oppression, or reckless disregard for plaintiffs rights.” We, in turn, have affirmed the punitive damages award. Maj. Op. at 1066 n.2.
There is no direct link between any of the alleged “choices” identified by the majority and Castro’s assault. The adoption of the Building Code provides no connection as the Code included a grandfather clause exempting buildings like the West Hollywood station from the new audio and visual monitoring standards. There was no evidence that the conditions in the sobering cell endangered detainees, absent the unauthorized placement of a violent detainee into the cell. There was no evidence showing that the “choice” of visual checks every 30 minutes was. insufficient to protect properly placed detainees.
In Clouthier v. County of Contra Costa, we noted the Supreme Court’s warning that “[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city ‘could have done’ to prevent the unfortunate incident.” 591 F.3d at 1253-54 (quoting Canton, 489 U.S. at 392, 109 S.Ct. 1197). We concluded that “Molding the County liable for the missteps of its employees in this case would therefore amount to ‘de facto respondeat superior liability,’ an avenue rejected in Monell.” This conclusion is equally applicable to this case. See Molton v. City of Cleveland, 839 F.2d 240, 246 (6th Cir. 1988) (noting that “[t]he City’s failure to build a suicide-proof jail cell, and its inadequate training of its police force, may well be acts of negligent omission, but they have not been shown to be the result of municipal policy: ‘a deliberate choice to follow a course of action ... made from among various alternatives *1084 by the official or officials responsible for establishing formal policy with respect to the subject matter in question.’ ”) (quoting Pembaur, 475 U.S. at 483, 106 S.Ct. 1292). On the record before us, holding the County liable is tantamount to de facto respon-deat superior liability, which the Supreme Court has consistently disapproved. See Connick, 563 U.S. at 61, 131 S.Ct. 1350; Canton, 489 U.S. at 392, 109 S.Ct. 1197.
V. Conclusion
Castro’s tragic injuries were a preventable tragedy, and we affirm the jury’s determination of the individual defendants’ culpability. However, the evidence proffered by Castro at trial doe's not support a finding that the County had a policy or custom that reflected deliberate indifference that led to Castro’s injuries. Castro presented insufficient evidence that audio monitoring was required for the West Hollywood station’s sobering cell in 2009. The adoption of California Building Code standards for audio and visual monitoring did not give the County even constructive notice that monitoring at the West Hollywood police station might be substandard because the Code includes a grandfather clause stating that the new standards are not applicable to existing structures. Moreover, there was no evidence of any prior incidents. The other alleged “choices” manufactured by the majority — the availability of other cells and “a policy to check inmates only every 30 minutes” — do not support a determination of deliberate indifference. Moreover, the immediate cause of Castro’s injuries was the individual officers’ placement of Gonzalez in Castro’s cell in direct violation of the County’s policy. In sum, there is insufficient evidence to support a finding of deliberate indifference by the County and there is no direct causal link between the County’s maintenance of the West Hollywood sobering cell and Castro’s injuries. Accordingly, I would vacate the award against the entity defendants.

. As the majority opinion makes clear, the judgment against the individuals is sound even under the standard set forth in Clouthier v. County of Contra Costa, 591 F.3d 1232 (9th Cir. 2010). Thus, while I agree with the majority that the judgment against the individual defendants should be affirmed, I do not join in its reasoning.

. The majority asserts that the sobering cell was non-compliant both because it “lacked all the required padding” and did not "allow for maximum visual supervision of prisoners by staff.” Maj. Op. at 1077-78. This seems to detract from its argument that there was a' "deliberate choice” not to monitor Castro.

. Nonetheless, in a footnote the majority suggests that the construction of the cell was a deliberate choice. Maj. at 1075 n.8. In support of this assertion, the majority cites a deputy who stated that they did not put a video camera in the cell "because of privacy issues.” However, the deputy also noted that there is a video camera outside the cell that is aimed through the cell door's window. In any event, the comments of a deputy whose assignment to the West Hollywood station began well after the station was constructed, do not support a finding of "deliberate choice in design and implementation.”

. The majority suggests that the County has failed to preserve the argument that there was no evidence of prior incidents of harm. Maj. Op. at 1074 n.7. But our inquiry is whether there are any indicia of a policy of deliberate indifference. The County's alleged waiver does not create evidence that was never admitted (and may not exist).

. The assertion at the end of the majority's footnote 9 that two or more belligerent drunks were housed in the detox cells many times, reflects the dangers inherent in an appellate court reviewing the record to determine facts that were not developed at trial. The officer who testified that two "belligerent” drunks might be placed in the same cell, defined belligerent as:
Not following instructions, just pretty much not wanting to be in there and just not going with the program, but it doesn't mean they were not getting along with other people. Just pretty much not helping us to give us information and just pretty much just manners kind of thing. Not physical. Not that they would show violence to people around them but mostly to the staff. Just annoyance kind of thing.
Moreover, as previously noted, there was also testimony that "99.9 percent of the time” when they had more than one belligerent and combative persons they would “take the less combative or belligerent of the two over to the Beverly Hills station and use their sobering cell.”