WHATLEY *v.* DELTA BROKERAGE & WAREHOUSE COMPANY

No. 42840 January 20, 1964 159 So. 2d 634

*Smith & O'Hare,* Cleveland; *Townsend & Townsend,* Drew; *Crisler, Crisler & Bowling,* Jackson, for appellant and cross-appellee.

*Clark, Townsend & Davis,* Indianola, for appellees and cross-appellants.

418

GILLESPIE, J.

James Dewitt Whatley sued Charles R. Buchanan and William Burton Moore, a partnership, doing business as Delta Brokerage & Warehouse Company, for personal injuries sustained by the plaintiff in the collapse of storage bins on the premises of the defendants. Judgment was entered on jury verdict in favor of the plaintiff for $15,000. Plaintiff appealed, contending the amount of damages awarded by the jury was grossly inadequate. Defendants cross-appealed, contending they were entitled to a directed verdict and that the trial court committed certain errors. We hold that there was no reversible error concerning liability, and that the amount of damages awarded plaintiff was so grossly inadequate that a new trial should be had on the question of damages only.

## ON CROSS-APPEAL

We state the facts on the question of liability in the light most favorable to the plaintiff in whose favor the jury found.

Defendants were engaged in operating a grain or soy bean storage business in Indianola. Early in 1961 they decided more space was needed for storage of soy beans. There was an old structure on defendants' premises consisting of several wooden storage bins. This structure rested on a concrete foundation fifty-two feet long by twenty-six feet wide. Around the perimeter was a curtain wall twelve inches thick and nine feet high measuring from the bottom of the pit. The curtain wall rose about three feet above ground level, so that the

entire concrete foundation formed a pit. Defendants knew the concrete slab forming the bottom of the pit contained no reinforcing material. Defendants decided to construct a larger metal storage facility on the site thus described and entered into a contract with Thomas A. Bates, owner and operator of Bates Sheet Metal & Supply Company, to construct the new storage facility. After being advised of defendants' wishes, Bates drew up the plans and specifications which both parties agreed upon. In the written contract between defendants and Bates, the latter warranted the structure against defective materials or workmanship for a period of twelve months after completion. The contract recited that Bates made no other warranty of products, materials· or design, either express or implied. Defendants were required to furnish to Bates the concrete foundation upon which to construct the new metal storage bins. The plans called for the construction by Bates of six large storage bins forty-eight feet high and four smaller bins of the same height. Bates was neither an engineer nor an architect. Defendants were neither engineers nor architects. Neither Bates nor defendants had the concrete foundation examined or tested to determine if it would bear the weight of the new bins and the weight of the beans to be stored therein. Nor did any person cause the plans or design of the new structure to be checked by an engineer, architect, or other competent person.

Bates proceeded to construct the bins in accordance with the aforesaid plans and one of the defendants observed the progress of the work. The structure rested partly on the concrete curtain wall and partly on two H beams grounded on the concrete slab which formed the bottom of the pit. These supports were near the center of the concrete slab, having been placed slightly off center to permit installation of a conveyor. Defendants knew the structure would be grounded in part on the

concrete slab although the original plans did not show such support. Defendants also observed the actual construction and knew the two H beams were grounded on the concrete slab.

When the construction of the bins was nearly complete, but still lacking interior bracing, defendants began filling the bins with soy beans. About a week before the collapse of the structure Bates noticed bulging of one or more of the bins which contained soy beans. Bates promptly requested defendants to remove the soy beans as soon as possible so the bins could be braced. Defendants failed to remove the beans and they were requested to do so a second time, but failed to comply. One of the large bins was full of beans and others partly filled on the morning of October 30, 1961, when the tanks trembled, the large tanks sank in the middle, and dropped down into the foundation pit. The whole structure then fell to the east on a warehouse on defendants' premises.

The interior H beams or column, which were about sixteen feet high, had punched through the concrete slab on which they rested and were driven about eight feet into the ground below. Plaintiff was working on the structure when it collapsed and was seriously and permanently injured. His job was that of a working foreman, but he had nothing to do with the design of the structure or the foundation. He had not seen the design of the structure prior to the collapse.

The instructions presented to the jury two theories of negligence: (1) Whether defendants failed to exercise reasonable care in failing to remove the beans from the uncompleted structure within a reasonable time after being requested to do so, and (2) whether defendants failed to use reasonable care to furnish a reasonably safe foundation for the work to be performed by Bates and his employees.

There was ample evidence to support the verdict for plaintiff on the question of liability on either or both of the theories presented to the jury. It was the sole duty and responsibility of defendants to use reasonable care in furnishing a reasonably safe foundation to support the proposed structure. It is undisputed that defendants made no effort to determine whether the concrete was sufficient to support the weight to be borne by it. The defendant Buchanan knew that supporting beams would rest on the six-inch concrete slab, although the plans did not show them. He also knew the beams were so placed during the actual construction. A competent expert testified that these beams placed 500 pounds weight to the square inch of concrete, and that the concrete was insufficient to support the weight placed upon it. The beams broke through the concrete slab and allowed the bins to drop down, then fall to the east.

Defendants filled some of the bins with beans before the internal bracing was installed, and some of the bins bulged. When this happened, Bates or his men twice requested defendants to remove the beans so the bracing of the bins could be accomplished. This was a week or ten days before the structure collapsed. Defendants failed to remove the beans and the proof showed that they continued to use the bins for storing and cleaning beans until the bins collapsed. The jury was justified in finding that the weight of the beans was a contributing cause of the collapse and that defendants were negligent in failing to remove the beans within a reasonable time after the request by Bates.

■■ ■ The main thrust of appellees' argument on the question of liability is that the plans and specifications were prepared by Bates, an independent contractor, and that since the structure was not of the type to require an architect, the appellees, as owners, are not liable for any defects in the plans or design or for any injuries resulting from hazards which arose during the progress

of construction. They rely on May v. Vardaman Manufacturing Co., 244 Miss. 261, 142 So. 2d 18, among other cases. This argument is untenable and cited case does not apply. In that case the building being constructed "was not of the type to require an architect." In the case at bar the proof showed that the structure being erected by Bates was a complicated one. The proof is ample to show that the building was the type that required the services of an architect or other competent person to properly and safely design the structure itself, and supervise its construction, and that an engineer or other competent person should have tested the foundation to determine whether it would support the structure. The proof showed that the concrete slab should have been thicker and reinforced with steel. Neither the defendants nor the contractor, Bates, were competent to design the structure or to determine whether the foundation was sufficient to support the weight of the structure.

In May v. Vardaman Manufacturing Co., supra, we held that an owner was not liable for failure to furnish his contractor's employees a safe place to work when an employee was injured by the collapse during construction of a simple building which did not require the services of an architect when the building was being constructed by a contractor who was competent and experienced in building that type of structure. It may be stated as a corollary to the rule laid down in May v. Vardaman that an owner is liable for failure to furnish his contractor's employee a reasonably safe place to work when such employee is injured by the collapse of an elaborate or complicated structure because the owner failed to use reasonable care to have an architect or other competent person design the structure and supervise its construction. ▆▆▆ Stated differently, we hold that where a person who is not competent himself to design and supervise the construction of an elaborate

or complicated building or structure, and fails to employ an architect or some other competent person to design and supervise such construction, he is liable for injuries to an employee of his contractor who sustains an injury as a proximate result of faulty design or construction. 44 A.L.R. 972, et seq.

We are not aware of any Mississippi case on this precise point, but that just stated is in full accord with standards of reasonable care which prevail in every area of the law of torts.

We have carefully considered the arguments made by the appellees. The fact that Bates was an independent contractor does not absolve appellees from liability in this case for the reasons already stated. The rule laid down in such cases as Craig v. Craig, 192 Miss. 271, 5 So. 2d 673, concerning the construction of buildings where the risk and danger are those which arise during the course of or in the progress of the work is not applicable.

We have considered the various assignments of error based on the instructions and find no reversible error. We conclude that the overwhelming weight of the evidence established the negligence of the appellees, and there is no reversible error insofar as the question of liability of the appellees is concerned. The case is affirmed on cross-appeal.

## ON DIRECT APPEAL

On direct appeal the sole question raised is whether the damages awarded the appellant are so inadequate as to evince bias and prejudice on the part of the jury. A subsidiary question is whether there was any evidence that appellant was guilty of contributory negligence.

At the time the structure collapsed appellant and another were working at the base of the structure. The tanks above him suddenly sank down and he ran for a doorway in the warehouse building of defendants immediately east of the tanks. He made it to the door and

the wall of the warehouse building fell on him, knocking him into some kind of box. His right arm went over the top of the box and the wall fell on it, pinning him in. He remained pinned under the debris for about two and one quarter hours before being removed. His chest was crushed and he was lying on his left side in the box. The dust from the soy beans was so heavy he could hardly breathe. He was taken to the hospital in Indianola and attended there by Dr. Arnold Hull, a general practitioner and surgeon. He was in intense pain. Dr. Hull described his injuries as follows:

"He had multiple bruises and scratches on his body; a puncture wound of the elbow; had a severe bruise of his breast bone; had a partial separation of the left collar bone from the breast bone; had a fracture of the right shoulder blade; had a severe injury to his right knee with torn ligaments and chipped fracture of the lower end of his thigh bone, and also a dislocation of the right knee joint; he had a severe pressure injury to his right arm just above the elbow and all the nerves of the lower arm were mashed, with paralysis of the right wrist and hand."

During his first week of hospitalization in Indianola he was given thirty-four injections of drugs to ease his pain. A posterior plastic splint was applied which ran from the upper part of his thigh to the end of his toes on the right side. After a week in the hospital at Indianola he was transported by ambulance to Campbell's Clinic in Memphis, where he was hospitalized under the care of Dr. Marcus Stewart, an orthopedic surgeon. Dr. Stewart diagnosed his injuries as follows:

"He had multiple bruises and contusions of the body, with a stocking type (complete) paralysis of the upper right arm from the elbow down, with a resultant pressure on the nerves. He had a complete dislocation of the right knee with obvious rupture of both the anterior and posterior cruciates. He had an obvious rupture of

the medial lateral collateral ligaments and multiple bruises and abrasions; he had a traumatic dislocation of the sternoclavicular left joint, a fracture of the medial plateau, and a fracture of the lateral femoral condyle (enlargement of end of thigh bone which supports the knee and leg). X-rays showed practically complete dislocation of the leg, with the outside of the leg being displaced outward on the thigh bone with a complete disruption of the ligaments which stabilize the knee. The main ligaments in his right knee were torn out by the trauma. His right arm from the elbow down was totally paralyzed and he could not even wiggle his fingers.''

The blood circulation in his right leg was poor because of the severe injury and he was kept in traction until November 14th in order to restore circulation. At the time his right knee was operated on by Dr. Stewart the operation confirmed his diagnosis of the injury to the knee. Dr. Stewart removed certain of the injured ligaments which were so badly damaged they could not be repaired and he made repairs to others and reattached these to the bone; he removed entirely the medial meniscus and the posterior cruciate ligaments, and the medical collateral ligaments were repaired and attached to the thigh and leg bone. A long leg plastic cast was placed on his leg fixing his knee at 170-degree position; his injured right arm was splinted and placed in a support. The sternoclavicular dislocation was treated by bed rest.

Appellant was released from Campbell's Clinic on November 19, 1961, and was taken by ambulance back to the hospital in Indianola, where he stayed until the first week of December 1961. He was then discharged to his home in Belzoni, and until April 16, 1962, went back and forth to Memphis every week and to the doctor at Indianola three times each week. On February 3, 1962, over three months after the injury, Dr. Stewart reported his right arm, hand and wrist showed return of function about fifty percent of normal, but that his

grip was only twenty-five percent of normal. He said the extensive discoloration and trauma of his right knee has caused a marked reaction of fibrous tissue which would take a long time to subside and that the range of motion in the knee was extremely limited. On April 9, 1962, six months after the injury, Dr. Stewart found that there was a failure of regeneration of the ligaments and their attachment to the knee cap which permitted the knee cap to slide medically. This made it practically impossible for the plaintiff to extend the knee and excess flexion or extension produced pain. He recommended further operative procedures on the knee.

On April 16, 1962, plaintiff was again admitted to the hospital in Memphis and surgery was performed on April 17, involving freeing of excessive adhesions which appeared through the entire knee joint, and cutting out of certain fibrous tissue in the knee joint until motion in the knee could be obtained. When the tendons attaching the knee cap to the leg bone were freed there was a wedge formation of bone attached to the tendons and this wedge of bone was countersunk into a prepared slot in the leg bone and attached with a stainless steel screw. Plastic surgery on the knee cap was performed, removing its deep half and the under portion then being covered with fat. Drainage tubes were placed in both sides of the joint and a long leg cast applied. Appellant remained in the hospital until April 28, 1962, when he was released in a long leg cast. Dr. Stewart last saw appellant on August 16, 1962, approximately ten months after the injury, and found that he had at that time a fifty to sixty percent disability of the knee, a twenty-five percent disability of the right arm, and was suffering pain in the area of his left chest where it is attached to the sternum. He also was suffering pain in the area of the fracture of his collar bone. It was the opinion of Dr. Stewart that appellant would suffer increased degenerative arthritis in his knee joint. He stated it

would be another six to eight months before he could definitely rate his permanent disability.

The medical expenses incurred by appellant for treatment of his injuries up to the date of trial were in the amount of $3,492.14. Appellant was to be under medical treatment for at least another six to eight months, and at the time of trial he was scheduled to go back to Campbell's Clinic for an operation on his chest, which would cause him to incur further medical expenses.

At the time of his injury appellant was earning $125.00 per week. He was out of work from October 31, 1961 until August 1, 1962, a period of 39 weeks, which caused him a wage loss in the amount of $4,775.00. On August 1, 1962 he returned to work for Tom Bates in an advisory capacity. He was given limited employment because of his personal friendship with Bates, but he was wholly unable to perform any kind of manual physical labor and unable to do the type work he was doing prior to his injury. Prior to his injury he was in good health and excellent physical condition.

At the time of the trial his left collar bone was about one inch higher than the right one and there was a space separation between his collar bone and his chest bone about as big as your finger and a large calcium deposit on the bone. He was scheduled for another operation for this. He had not gotten full use of his right hand, and was unable to hold objects in his hand for any length of time without the objects slipping out; he could not straighten his right leg and had a numb area near the knee; he could not move his leg and knee sideways; he could not squat down, walk up steps, drive a car, stand on his feet for any prolonged length of time, and was generally disabled to perform the lifting, climbing and other activities his job required before he was injured. He has to massage his leg and arm regularly and take exercises. Dr. Hull said he would have a permanent disability to his knee and would be unable to per-

form the type work he was doing prior to his injury. His greatest disability arises from the stiffness and limitation of motion in his knee. Appellant had out of pocket expenses for medical treatment and loss of wages in the amount of $8,267.14 at the time of trial.

 We are of the opinion that the damages awarded appellant in this case are so grossly inadequate as to evince prejudice and bias on the part of the jury. A mere statement of his injuries, medical expenses, and loss of earnings is sufficient basis for our conclusion.

 We have carefully considered the contention that the jury had a right to diminish damages because of the contributory negligence of appellant. Undoubtedly the jury had a right to diminish damages in proportion to the amount of negligence, if any, attributable to the plaintiff, even though no instruction to this effect was requested by either party. Vaughan v. Bollis, 221 Miss. 589, 73 So. 2d 160.

 Appellant was designated a foreman. He was actually a working foreman, but the record shows that he had nothing whatever to do with the furnishing of the defective foundation or with the preparation of the design for this building. He had never seen the blue prints, which were very sketchy, and if he had seen the blue prints, he was not shown to be a person who could be charged with notice of any defect or fault in the design of the building. The building had been partly erected when he came upon the job. The answer of the appellees in this case charged in a general way that appellant's negligence contributed to his injuries, but did not state what act or omission of appellant constituted negligence. We find no evidence of contributory negligence. We hold that the jury could not have properly diminished the award because of contributory negligence.

For the reasons stated, the case is affirmed as to liability and reversed and remanded for a new trial on the question of damages only.

Reversed and remanded for new trial on the issue of damages only on direct appeal; affirmed as to liability on cross-appeal.

*Lee, C. J., and Ethridge, McElroy and Brady, JJ.,* concur.