**Charles D. MILES, Plaintiff-Appellant,**

v.

**VICKSBURG CHEMICAL COMPANY, Defendant-Appellee.**

No. 76-4476.

United States Court of Appeals, Fifth Circuit.

Jan. 26, 1979.
Rehearing and Rehearing En Banc Denied Feb. 26, 1979.

Landman Teller, Jr., Vicksburg, Miss., for plaintiff-appellant.

Joel W. Howell, III, Thomas A. Bell, Jackson, Miss., for defendant-appellee.

Before COLEMAN, CLARK and RUBIN, Circuit Judges.

COLEMAN, Circuit Judge.

Charles D. Miles filed suit in state court against Vicksburg Chemical Company (Vicksburg) for personal injuries sustained when he walked into caustic soda on the first day he was employed as a carpenter at the site of Vicksburg's plant. Vicksburg Chemical removed the case on diversity of citizenship to the District Court. A jury awarded damages in the sum of $58,000. Thereafter, the District Judge sustained Vicksburg's motion for judgment notwithstanding the verdict. In the alternative, he awarded the defendant a new trial unless the plaintiff should agree to accept a remittitur in the amount of $28,000. Miles appeals. We reverse the award of the judgment notwithstanding the verdict and the alternative award of a new trial.

I

During the fall and winter of 1974–75, Vicksburg Chemical Company, an Arkansas corporation, contracted with Steel Fabricators, at cost plus, to construct herbicide (bladex) production facilities at Vicksburg Chemical's plant site. On these premises, at the top of a hill, there were three large tanks, one of which contained caustic soda. This is a clear, odorless, highly alkaline liquid, used in the production of certain herbicides. The new facilities were being built at a point below the tanks, which were enclosed by a three to four foot high concrete protection dam, designed to prevent the escape into the surrounding area of any chemical which might leak or spill from the tanks. Such a dam would normally have been waterproof, but because of recent heavy rains, a hole (or holes) had been drilled into the dam to permit drainage of the water which had collected inside the enclosure. The tanks and the protection dam were under the exclusive control of Vicksburg Chemical.

Shortly before the day Miles began work, a mechanical failure in the pump for the caustic soda tank caused some of the substance to spill onto the concrete apron, which then drained down hill through the hole that had been drilled, saturating an area below.

At some date prior to the time Miles began work, Otto Logue, safety director for Vicksburg Chemical, called a meeting with management and supervisory personnel of Steel Fabricators to discuss the situation created by the presence of caustic soda in

the work area. It was known, of course, that the soda would burn a person upon contact. The two companies agreed that the work should proceed, and it was recommended that the employees of Steel Fabricators wear rubber boots and gloves while working in this area. The evidence as to whether Steel Fabricators or Vicksburg Chemical controlled and supervised the actual work site was vague and, to some extent, contradictory. In any event, it was on Vicksburg's premises, immediately adjacent to the remainder of its herbicide manufacturing operations.

On the morning of December 16, 1974, Charles Miles, a carpenter, was hired by Steel Fabricators to work on the construction of the new plant. He was assigned to a place in an area which had been infiltrated by the caustic soda. His job was to wreck forms from a retaining wall. He was wearing *leather* work boots with rubber soles and rubber heels, jeans, long johns, and a light jacket. Miles testified that he was not warned by Steel Fabricator's supervisors to stay out of the muddy area because of the caustic soda, nor did he recall being told to wear rubber boots and gloves the next day. Additionally, he claimed that most of the other workers he saw in the area wore leather boots and no gloves. At least two defense witnesses, both of whom had been employees of Steel Fabricators at the time of the accident, testified that either they warned Miles of the danger or else they heard him being warned. Other defense witnesses were not so clear on this point. They said, in general, only that Miles was told not to go down "in the hole", but was to stay on the bank. The mud was up to four feet in depth.

An hour or two after Miles began working, his feet were wet and cold, and upon reaching the carpenter shed while going for coffee he noticed that his boots were smoking. He took them off because of a freezing sensation. He realized, then, that his feet had been burned. The left foot had turned black and the skin was peeling off. He was taken to Vicksburg Chemical's first aid station, where the nurse washed his feet with vinegar to neutralize the effects of the

strong alkaline. A hole had been burned in his left foot, to the bone. The nurse dressed the burns, gave him a tetanus injection and some aspirin, and sent him home. The next morning he returned to have the nurse check on his feet because he was still in a great deal of pain. The nurse then realized that Miles had third degree burns on his left foot and sent him to the hospital. He was admitted to the hospital that day, December 17. On December 20, a debridement, or removal of dead or severely injured tissue, was performed under general anesthesia. Miles was released from the hospital on December 23 to be home at Christmas and was readmitted on December 27. On January 10, 1975, a skin graft was performed on his left foot. Miles was released from the hospital on January 17, but had to be readmitted on January 27 for treatment of thrombophlebitis, which the doctor said was a direct result of the injury to his foot. He remained in the hospital until February 7, receiving anticoagulant medication for the phlebitis, as well as continued treatment of his burns.

On February 17, Miles was again admitted to the hospital, complaining of severe pain in the lower abdomen and lower chest, severe headaches, vomiting, blood in his urine, and fainting spells. These symptoms were determined to have been caused by the anticoagulant medication he was taking, which was discontinued at this time. He remained in the hospital until February 24, when he was finally released.

After his release from the hospital, Miles continued to he treated by his doctor as an outpatient for two months. He was able to resume "light duty" work in March, 1975, and by June, 1975, was working full time. During the entire period of hospitalization and recovery, Miles was paid his full salary by Steel Fabricators, so he sustained no loss of wages.

At the time of this appeal, Miles was working full-time as a self-employed carpenter, although occasionally suffering moderate pain and swelling in his left foot after prolonged work periods. His doctor

testified that no permanent disability would result from the burns.

## II

This was not a case in which an independent contractor was sent to work at a site located away from the scene of the plant owner's operations. The work was being done at the headquarters of the company which had let the contract. It was within the constant observation of that company. The company had discharged a colorless, odorless, caustic liquid onto the work site. It had posted no warning signs. It gave no warning directly to the workmen. It relied altogether on the fact that it had verbally informed the independent contractor of the hazard, suggesting that while working in the mud at the affected area Steel Fabricators' employees should wear rubber boots and rubber gloves. So far as this record shows, Vicksburg did not bother to ascertain whether its recommendations were being complied with. Vicksburg's defense is that it had warned the independent contractor and that this was enough to insulate it from liability for any injuries sustained by those working at the affected location.

That Miles was severely and painfully burned is not disputed. By its verdict, the jury found that Steel Fabricators had not adequately warned Miles of the danger. It had allowed Miles to go to work without wearing rubber boots.

In this diversity case it is axiomatic that any liability of Vicksburg and any remedy due Miles are governed by Mississippi law.

The case was submitted for a general jury verdict (no special interrogatories). The jury was instructed:

And in this regard, with respect to the duty to warn, I instruct you that the discharge of this duty to warn, with reference to any unsafe or perilous condition which may exist upon its premises, is discharged by an owner by giving the warning to the superiors in employment of the person to whom the duty is owed. In other words, it is discharged by the owner giving warning, adequate and timely warning, of any dangerous or perilous conditions that exist, to the superiors, that is the supervising or managerial personnel of the independent contractor who was employed by the owner to do the work on the job and that such warning, if any, is adequate warning to the employees of that independent contractor performing the job on the owner's premises.

Counsel for Miles objected to this instruction. The objection was overruled. As already noted, the jury found for the plaintiff and assessed his damages at $58,000.

Thereafter, the District Court set aside the jury verdict and awarded judgment in favor of Vicksburg Chemical.

In doing so, it issued a memorandum opinion in which it noted:

The Mississippi Supreme Court has never had occasion, however, to state whether Mississippi law requires a warning of dangerous conditions to both the independent contractor and its employees or whether notice to the contractor constitutes notice to its employees.

The Court then proceeded as follows:

The undisputed evidence in this case shows that approximately two weeks before plaintiff's injury, prior to the time that work commenced on the Bladex plant, Mr. Otto Logue, safety director for Vicksburg Chemical, called a meeting with all managerial and supervisory personnel of Steel Fabricators, plaintiff's employer, at which time he warned Steel Fabricators' personnel of the dangerous conditions created by the presence of caustic soda on this job site. At this time Steel Fabricators was permitted to go forward with construction on the plant on the express condition and promise that it would warn all of its employees of the presence of caustic soda and of its dangerous nature and that it would require all of its employees on the job site to wear protective clothing consisting of rubber boots and gloves. Under the general rule of law stated above, which we believe would be applied by the Mississippi Supreme Court, Vicksburg Chemical thereby completely discharged its duty to

the plaintiff with respect to warning of the dangerous conditions existing at the site of the Bladex plant.

As authority for this result, the Court cited dicta in *Hobart v. Sohio Petroleum Company*, 255 F.Supp. 972 (N.D.Miss., 1966), aff'd per curiam, 376 F.2d 1011 (5th Cir., 1967), as well as a similar case, decided under Texas law, *Gulf Oil Corporation v. Bivins*, 5 Cir., 1960, 276 F.2d 753.

■ There can be no doubt that under Mississippi law, Vicksburg Chemical had the *sole* duty and responsibility to use reasonable care in furnishing a reasonably safe place for the work to be performed by Steel Fabricators *and its employees, Whatley v. Delta Brokerage and Warehouse Company*, 248 Miss. 416, 159 So.2d 634 (1964).

The *Whatley* decision was but a logical extension of *Dobbins v. Lookout Oil and Refining Company*, 133 Miss. 248, 97 So. 546 (1923), wherein it was held that if the employer knows or ought to know the dangers to which his employee will be exposed, and knows or ought to know that the employee is unable to appreciate the danger, it is the duty of the employer to give the employee such instruction and warning of the character of the work as will reasonably enable him to understand and avoid its perils.

Citing *Whatley*, the Mississippi Supreme Court, in *Ingalls Shipbuilding Corporation v. McDougald*, 228 So.2d 365 (Miss., 1969), said

> [O]ne who employs an independent contractor is nevertheless answerable for his own negligence. So an employer owes a duty to an independent contractor and the latter's employees to turn over to them a reasonably safe place to work or to give warning of danger.
>
> 228 So.2d at 367.

This opinion, authored by the late Chief Justice Ethridge, handed down by a unanimous court, points out that *the duty is owed not only to the independent contractor but is also owed to the employees*. The alternative, stated in the same sentence, is "to give warning of danger". If the duty is owed to both the independent contractor and to its

employees it might well be argued that the warning is owed to both, that if the Court had intended to hold that the warning was due only to the independent contractor it could easily have added that limitation at the end of the sentence, especially since it must be assumed that the learned Court knew that it had never held that a warning to the independent contractor alone would negate any necessity for warning the employees.

The fact remains, however, the in *Ingalls* the Supreme Court did not discuss the nature or the scope of the warning required of the contractor in favor of the employees of an independent contractor.

The negligence of Vicksburg Chemical was active, not passive. By its own negligence it had created the hidden danger; it punched the holes and released the caustic soda. If Miles, or any other employee, failed to take the appropriate precautions he would be burned by the chemical, which was both colorless and odorless, giving no warning of its presence. The situation was not altogether unlike a rattlesnake coiled under a log, waiting on the unsuspecting individual to step over the log. This was not a case of passive negligence at a work site distantly removed from the scene of Vicksburg's operations. It is also significant that in *Whatley, supra*, the Supreme Court twice pointed out as an element of the defendant's negligence that it "observed the progress of the work".

■ Under the facts of this case we need not decide in isolation whether a warning to the independent contractor will, or will not, insulate the prime contractor from liability. This is so because the proof in any event made a clear jury issue on the *adequacy* of the warning given to the independent contractor. Even if we were to assume that the duty to warn ordinarily is discharged by a warning to the independent contractor's supervisor, a point which, as we have pointed out, has not been decided by the Supreme Court of Mississippi, the question remains as to whether the warning given here was sufficient to discharge the duty to warn. Indeed, the district judge instructed

the jury that a warning given must be an adequate one in the light of the danger to the workmen arising from the presence of the caustic soda in the mud pit. The jury returned only a general verdict. It could reasonably have concluded that the warning given did not discharge that duty, whatever the scope. Vicksburg Chemical was aware of the soda leakage from the tanks, indeed it had caused it. The jury could have found that the perils caused by the discharged soda necessitated a more emphatic warning then the verbal one given. The jury could reasonably have decided, for example, that Vicksburg Chemical, at the very least, should have placed warning signs around the area saturated by the soda.

Accordingly, we reverse the award of the judgment notwithstanding the verdict and remand the case with directions that the jury verdict on liability be reinstated.

The District Court directed a new trial on the issue of damages unless the plaintiff entered a remittitur, reducing the amount of the judgment by almost fifty per cent, that is, from $58,000 to $30,000. Miles was not only severely and painfully burned. He contracted thrombophlebitis as a direct result of the burns. More than that, he was rendered seriously ill by the medication prescribed to combat the phlebitic condition. Under general anesthesia, he suffered a debridement of the burned area. He was in the hospital for several weeks.

In the granting of a remittitur, "[A]n appellate court will find an abuse of discretion only when it appears that the jury's original verdict was clearly within the universe of possible awards which are supported by the evidence", *Bonura v. Sea Land Service, Inc.*, 5 Cir., 1974, 505 F.2d 665. The award here is clearly within the universe of possible awards which are supported by the evidence. Consequently, the trial court should not have ordered a remittitur for excessiveness of the award.

We have already held that the judgment notwithstanding the verdict should not have been granted on the issue of liability. The motion for a new trial contains several attacks on the liability aspects of the verdict, all of which are rejected in the foregoing opinion.

The only other ground asserted for a new trial was excessiveness of the verdict. That, too, we have just found to be without merit.

Therefore, the judgment of the District Court is reversed. The case is remanded with directions to reinstate the verdict and to enter judgment on the verdict.

REVERSED and REMANDED.