755 So.2d 495 (1999)
Marilyn HOUSTON, Appellant,
v.
Bennett V. YORK and M & N Builders, Inc., Appellees.
No. 97-CA-01415-COA.
Court of Appeals of Mississippi.
May 18, 1999.
Rehearing Denied January 18, 2000.
Certiorari Denied April 27, 2000.
*496 David G. Hill, David L. Minyard, Maurie L. White, Oxford, Attorneys for Appellant.
Paul M. Moore, Jr., Calhoun City, T. Swayze Alford, Oxford, Attorneys for Appellees.
BEFORE THOMAS, P.J., LEE, AND SOUTHWICK, JJ.
THOMAS, P.J., for the Court:
¶ 1. Marilyn Houston appeals from the Lafayette County Circuit Court upon grant of directed verdict for Bennett V. York and M & N Builders, Inc. at the conclusion of the her case. Three days of trial, which began on September 15, 1997, had been held. Houston's complaint, filed on September 9, 1992, asserted several claims against York and M & N Builders, two of which were the negligent design and construction of a fireplace mantle and breach of the implied warranty of habitability, both of which, as alleged in the complaint, resulted in personal injury to her person when the mantle fell and struck her in the head on March 8, 1989. From the circuit court's grant of a directed verdict in favor of York and M & N, Houston assigns the following assignment of error:

I. WHETHER THE CIRCUIT COURT ERRED IN GRANTING A MOTION FOR DIRECTED VERDICT FOR THE DEFENDANTS.
Finding error, we reverse and remand for a new trial.

FACTS
¶ 2. In January 1989, Marilyn Houston leased an apartment in a duplex unit owned by Bennett York and located in Oxford, Mississippi. Houston, at the time *497 of the lease and the injury, was a graduate student at the University of Mississippi pursuing a masters degree in southern studies and was employed as a project coordinator with the African-American studies program. On March 8, 1989, Marilyn Houston was struck in the head by an unsecured fireplace mantle after it fell from its rest atop protruding bricks at both ends of the fireplace while she and her son, Kevin, were attempting to start a fire. Houston was unable to lift a large log alone, so she asked Kevin for assistance. As Kevin bent down to lift one end of the log while Houston readied at the other end, Kevin placed his left hand on the mantle as a brace. The mantle then fell and struck Houston on the head. The mantle was constructed of laminated two by fours nailed together to form a single beam and was not attached in any manner to the fireplace itself.
¶ 3. After the mantle beam fell and struck Houston on the head, Kevin assisted his mother to the couch and called an ambulance. Houston was taken to Lafayette County Hospital, where she was hospitalized for two and a half days as a result of the closed head injury she received. In the weeks that followed her accident, Houston continued to complain of headaches and vision problems as well as difficulty in verbal communication and object identification. Houston eventually returned to work and her academic studies at the University of Mississippi but continued to experience headaches and communication difficulties.
¶ 4. After her studies at the University of Mississippi were completed, Houston moved to New York City to pursue a Ph.D. in anthropology at New York University after receiving a scholarship from the National Science Foundation. While pursuing her Ph.D. at N.Y.U. Houston continued to experience learning difficulties and sought help through the Student Disability Services Office, who provided her with note takers and mechanical readers to help aid in her studies. Houston later contacted a head trauma specialist, Dr. David Kay, to inquire about treatment for her learning difficulties. Doctor Kay referred Houston to VESID, a state funded vocational rehabilitation program in New York. Houston's condition was confirmed under VESID's disability guidelines, and she was referred to Dr. Owen Kieran, M.D. of the New York University Medical Center. VESID funded her treatment with Dr. Kieran at the Rusk Institute of Rehabilitation Medicine.
¶ 5. Dr. Kieran opined that Houston's learning difficulties were attributable to the minor closed head injury she suffered on March 8, 1989. Dr. Kieran testified that the blow the Houston's head caused microscopic changes in her brain including the stretching and tearing of axons and neurofibril. Dr. Kieran also opined that Houston suffers from permanent cognitive brain injury which adversely affects her higher brain functions. Dr. Kieran attributes Houston's learning disabilities to the March 8, 1989 injury. In an effort to combat her learning deficits, Houston, with the aid of the Rusk Institute, was able to develop learning strategies which have increased her ability to function in her academic profession. With the aid of the newly learned strategies, Houston eventually received her Ph.D. from New York University in May 1997 and was shortly hired thereafter as a professor at South Carolina State University and then later, in her current position, at the University of South Carolina as a professor as well. Despite Houston's apparent success, she alleges that as a result of the closed head injury she received in March 1989, she will never attain her previous potential as an academician in her chosen profession. Houston alleges that she will always function on a reduced level of academic proficiency in her field. Houston attributes her diminished capacity to the March 1989 closed head injury.
¶ 6. Houston filed her complaint on September 9, 1992, alleging negligence in the design and construction of the fireplace *498 mantle which fell and struck her in the head on in March 1989. Following discovery, Houston filed to amend her complaint to reflect suit only against York and M & N Builders on September 16, 1994, and an order was entered to reflect the same on October 25, 1994.
¶ 7. Bennett York is a dentist in Hattiesburg, Mississippi and a commercial and residential real estate developer. In 1983, York planned to expand his real estate developments into Oxford, Mississippi. York's son would soon be attending the University of Mississippi, so York decided to build several duplexes in Oxford to provide housing for his son and to generate income. York was referred to Rex Marshall, a building contractor and owner of M & N Builders, by a man named Stanton Howard whom York had known for several years. Howard advised York that he had worked for Marshall on several jobs and considered Marshall an experienced contractor. Based on Howard's recommendation, York hired Marshall to construct the duplexes.
¶ 8. Marshall traveled to Hattiesburg to meet with York and to inspect some of York's existing duplexes to get an idea of how York wanted the Oxford duplexes built. Marshall was also provided a basic floor plan from which to construct the duplexes as well as a list of the specifications for their construction. In essence, Marshall was to construct the Oxford duplexes along a similar design as those owned by York in Hattiesburg without the aid of any detailed architectural plans. Marshall was to construct the duplexes based on his experience and knowledge as a contractor provided they met the general floor plan and the specifications provided by York. The specifications for the construction of the fireplace mantle were not included in the specifications provided by York; its construction and design were left to Marshall's discretion with the exception of the actual location of the fireplace.
¶ 9. Marshall admitted, as did York, that the fireplace mantle was not of a good design due to the mantle not being attached to the fireplace in a secure fashion. During the construction of the duplexes, York made sporadic trips from Hattiesburg to Oxford to inspect Marshall's progress. These inspections consisted of a basic "walk through" of the construction site. Marshall also testified that the construction of the fireplace masonry work was subcontracted to a man named Carnell but that he personally did not know who actually placed the mantle atop the protruding bricks. Both Marshall and York deny ever having inspected the completed fireplace mantle.
¶ 10. Houston offered the expert testimony of Kirk Rosenhan, an expert in the general field of engineering. Rosenhan testified that the mantle was not attached in any manner to the bricks of the fireplace. Rosenhan opined that due to the co-efficient of friction between the smooth boards of the mantle and the bricks of the fireplace, the mantle was susceptible to dislodgement with very little force. Rosenhan also testified that the mantle could have very easily been secured to the bricks and that the materials were readily available at many hardware stores. Rosenhan further opined that given the height and weight of the mantle, a fall from its height on the fireplace was well past the threshold limit for damage to a human skull. In short, Rosenhan opined that the mantle was not constructed or secured in a manner consistent with the reasonable methods available in the construction and securement of the fireplace mantle.
¶ 11. After presenting three days of evidence and testimony, Houston rested her case. York and M & N Builders then moved for a directed verdict, which the trial court granted in favor of both defendants. Without any degree of specificity, the trial court concluded that there was insufficient evidence presented to create an issue in need of submission to the jury. We hold otherwise.

*499 ANALYSIS

I.

WHETHER THE CIRCUIT COURT ERRED IN GRANTING A MOTION FOR DIRECTED VERDICT FOR THE DEFENDANTS.
¶ 12. On appeal, we conduct a de novo standard of review of motions for directed verdict. When deciding whether the granting of a motion for directed verdict was proper by the lower court, this Court considers the evidence in the light most favorable to the non-moving party and gives that party the benefit of all favorable inferences that may be reasonably drawn from the evidence presented at trial. Sperry-New Holland, a Div. of Sperry Corp. v. Prestage, 617 So.2d 248, 252 (Miss.1993). If the favorable inferences have been reasonably drawn in favor of the non-moving party so as to create a question of fact from which reasonable minds could differ, then the motion for directed verdict should not be granted and the matter should be given to the jury. Id.; Pace v. Financial Sec. Life of Mississippi, 608 So.2d 1135, 1138 (Miss.1992); Vines v. Windham, 606 So.2d 128, 131 (Miss.1992).
¶ 13. In arguing her appeal, Houston has asked this Court to extend the so called Whatley standard of care, Whatley v. Delta Brokerage & Warehouse Co., 248 Miss. 416, 425, 159 So.2d 634, 637 (1964), to personal injury suits between a tenant and the landlord/owner wherein the injury results from the negligent design or construction of residential rental property buildings or structures. Whatley involved a negligence action brought by an independent contractor's employee to recover damages from the owner of the site for injuries sustained when a grain bin constructed by the contractor collapsed. The defendants, Delta Brokerage & Warehouse Company, contracted Bates Metal & Supply Company to construct six large storage bins forty-eight feet high and four smaller bins of the same height. Delta provided Bates with the specifications from which to create to plans. Delta was required to furnish Bates with the concrete foundation upon which the bins were to be constructed. Neither Delta nor Bates were experienced architects or engineers. Further, neither Delta nor Bates employed an architect, engineer, or competent person to study the design or plans to determine if the concrete foundation would support the weight of the bins when filled. Whatley, 248 Miss. at 422, 159 So.2d at 635. James Whatley was working at the construction site when the structure's support beams punched through the concrete foundation, collapsed and injured him. Evidence produced at trial revealed that Bates had twice requested Delta, but to no avail, to remove the soy beans which had been placed in the uncompleted bins after Bates noticed bulging in several of the bins. Id.
¶ 14. Affirming as to Delta's liability, the supreme court held that:
[A]n owner is liable for failure to furnish his contractor's employee a reasonably safe place to work when such employee is injured by the collapse of an elaborate or complicated structure because the owner failed to use reasonable care to have an architect or other competent person design the structure and supervise its construction. Stated differently, we hold that where a person who is not competent himself to design and supervise the construction of an elaborate or complicated building or structure, and fails to employ an architect or some other competent person to design and supervise such construction, he is liable for injuries to an employee of his contractor who sustains an injury as a proximate result of faulty design or construction.
Whatley, 248 Miss. at 424, 159 So.2d at 637.
¶ 15. In so arguing that this Court should apply the Whatley standard of care in a landlord-tenant situation where the tenant has suffered a personal injury *500 resulting from the alleged design or construction defect in the residential structure, Houston is asking this Court to disregard our already established standard of care covering landlord-tenant relationships. Additionally, the Whatley standard of care has only received reference in a limited and specific number of cases, all of which involved master and servant law. See Sumrall v. Mississippi Power Co., 693 So.2d 359, 363 (Miss.1997); Mississippi Chemical Corp. v. Rogers, 368 So.2d 220, 222 (Miss.1979); Mississippi Power Co. v. Brooks, 309 So.2d 863, 866 (Miss. 1975). Therefore, the Whatley standard of care is inapplicable to the facts and circumstances of the case before us today; however, the issue presented on appeal can be aptly addressed under well settled landlord-tenant law.
¶ 16. Our supreme court has recently revisited this issue in Sweatt v. Murphy, 733 So.2d 207 (Miss.1999). In April 1995, Steven Sweatt and his wife began renting a house from Paul and Therese Murphy in Gulfport, Mississippi. On April 30, 1995, Sweatt was injured when the porch swing in which he was sitting fell from the ceiling when one of its support hooks connecting the swing with the ceiling cracked and gave way. As a result of the fall, Sweatt was diagnosed with a lumbar disc herniation. Sweatt brought suit against the Murphys alleging that the Murphys' failure to comply with the Residential Landlord and Tenant Act, Miss.Code Ann. § 89-8-1, et seq. (Rev.1991) equated to negligence per se for all violations of the Housing Code "materially affecting health and safety."
¶ 17. At trial, Sweatt's requests for instructions on the RLTA and/or the Standard Housing Code were denied. The jury returned a verdict in favor of the Murphys on the personal injury claim. On appeal Sweatt unsuccessfully advanced the argument that the Murphy's failure to comply with the RLTA's provision mandating landlords/owners to comply with applicable "housing codes affecting health and safety" was the equivalent of negligence per se or strict liability and relied on O'Cain v. Harvey Freeman and Sons, Inc. of Mississippi, 603 So.2d 824 (Miss.1991). The supreme court, in rejecting Sweatt's argument for strict liability, reiterated Justice Sullivan's O'Cain concurrence opinion and clarified its previous holding:
Recognizing that building and housing codes which affect health and safety generally are often governed locally, I advocate that the bare minimum standard for an implied warranty of habitability should require a landlord to provide reasonably safe premises at the inception of a lease, and to exercise reasonable care to repair dangerous defective conditions upon notice of their existence by the tenant, unless expressly waived by the tenant.
Sweatt, 733 So.2d at 210 (citing O'Cain, 603 So.2d at 833) (Roy Noble Lee, Prather, Robertson, and Banks also concurred, thus giving the opinion precedential value).
¶ 18. The Sweatt court further expounded on the issue addressed in O'Cain:
It is thus apparent that the concurrence in O'Cain advocated a general implied warranty of habitability for residential leases, and not the sort of strict liability for all housing code defects advocated by Sweatt herein. These concurring justices did interpret the incorporation of housing code standards into the RLTA as an indication that the Legislature intended to abolish the doctrine of caveat emptor with regard to residential leases in favor of an implied warranty of habitability. This Court has never held, however, that a lessor is strictly liable in tort for each and every violation of housing code provisions, as Sweatt would seem to advocate.
Sweatt, 733 So.2d at 210.
¶ 19. We note that while Houston did not advance the argument of strict liability on appeal as was the case in Sweatt and instead elected to advance an argument based on the Whatley standard of care, *501 which we find inapplicable, she did raise the issue of strict liability in her complaint. Houston raised the issue of warranty of habitability as well, alleging that the plaintiff breached said warranty. In so concluding that the implied warranty of habitability is the rule of law in this State in lieu of the once controlling doctrine of caveat emptor as was held in O'Cain and in light of the unsuccessful attempt at advancing a strict liability which was rejected in Sweatt, the case before us today must be analyzed under the implied warranty of habitability.
¶ 20. In light of the testimony and evidence presented at trial on the issue of the mantle's design, construction, and securement, or lack thereof, we conclude that sufficient evidence was presented by Houston, and by York and M & N Builders for that matter, in establishing a disputed issue of fact to which reasonable minds could differ as to the issue of negligence under the implied warranty of habitability. Both York and Marshall testified that neither of them had conducted an inspection of the mantle upon its completion or anytime thereafter. The expert testimony provided by Rosenhan further supports the issue of negligence under the implied warranty of habitability in opining that alternative methods for the mantle's securement were readily available at many hardware stores and that its original placement simply atop the protruding bricks was insufficient to prevent the mantle's potential for dislodgement upon the application of very little force.
¶ 21. Under the implied warranty of habitability doctrine, the landlord/owner warrants to the tenant that the structure was built in a workmanlike manner and is suitable for habitation. In recognizing the implied warranty of habitability in lieu of the doctrine of caveat emptor, Justice Sullivan's concurrence in O'Cain further exemplifies the rationale for accepting the implied warranty of habitability as the law of this State:
The better view is to recognize that landlords are not selling an interest in land, residential tenants do not intend to purchase an interest in land, residential leases are contracts, and landlords have more incentive and opportunity than tenants to inspect and maintain the condition of the premises. See Becker v. IRM Corp., 38 Cal.3d 454, 213 Cal.Rptr. 213, 217, 698 P.2d 116, 120 (1985); Javins v. First Nat'l Realty Corp., 428 F.2d 1071, 1074 & 1079 (D.C.Cir.1970).
O'Cain, 603 So.2d at 832.
¶ 22. The advent of the implied warranty of habitability as law in this State has shifted a greater burden of responsibility to the landlord/owner requiring him to use reasonable care to provide safe premises fit for human habitation through inspecting, maintaining, and repairing the residential lease unit. However, this is not to say that the tenant is completely removed from the responsibility of bringing known defects in need of repair to the landlord's attention or making a reasonable inspection of the leased premises for defects or dangerous conditions which are reasonably detectable to the average person. The landlord's tort liability for failure to use "reasonable care to provide safe premises" when the tenant has suffered personal injury as a result is best stated in Justice Sullivan's words:
This is not to say that a landlord is an insurer of safety. A landlord is not. Making a landlord subject to tort liability merely requires him to act as a reasonable landlord under the circumstances of the case. The tenant would still be required to show duty, breach, causation, and damages, and the landlord would be entitled to raise the standard tort defenses, such as contributory negligence, unforeseeability or intervening cause.
O'Cain, 603 So.2d at 833.
¶ 23. Turning to the issue of M & N's liability, we are equally persuaded that in light of the evidence and testimony presented at trial, sufficient offerings of *502 proof were presented from which reasonable minds could differ in their opinions as to M & N's negligence in designing and constructing the fire place mantle. As previously stated, both York and M & N testified that neither of them had ever conducted any type of inspection with regard to the design and construction of the fire place mantle. Further, Marshall, M & N's owner, also admitted that the fireplace mantle was not of a good design due to the mantle not being attached to the fireplace in a secure fashion. This testimony was further supported by Houston's expert, Rosenhan, who opined that the simple placement of the mantle atop the protruding bricks was an insufficient method of securing the mantle.
¶ 24. In George B. Gilmore Co. v. Garrett, 582 So.2d 387 (Miss.1991), our supreme court held that a building contractor who complied with the plans and specifications for building a house over Yazoo clay could nevertheless be held liable for subsequent damage done to the house as a result of expansions in the clay, despite the fact that the plans did not call for soil tests and that there were no requirements for such tests in the local building trade area. Implied in every building contract, is the notion that the work will be preformed in a skillful, careful, diligent and good workmanlike manner; conducting a reasonable inspection is understood to be included in this notion. See George B. Gilmore, 582 So.2d at 395.
¶ 25. In approving the jury's finding of liability against Gilmore, the owner of George B. Gilmore Company, the court noted:
It is, of course, true that a builder/contractor in an ordinary case should not be required to go beyond the plans and specifications, they after all being part of his contract spelling out his obligations. Neither should plans and specifications which clearly do not take into account a construction problem of which the builder/contractor, the man with expertise should be well aware, remove from ham all duty to warn. In such case plans and specifications should not constitute an absolute defense.

* * *
An implied warranty of habitability is that the contractor/builder warrants the house has been built in a safe and workmanlike manner. A contractor/builder who fails to construct a house in a reasonably safe and workmanlike manner is negligent, in any event.
George B. Gilmore, 582 So.2d at 396. (citations omitted) (emphasis added).
¶ 26. In the case sub judice, the plans and specifications for the mantle, as well as the construction, was left to M & N. The contracted job, as a whole, was essentially a turn-key project consisting of general plans and specifications which were provided to M & N by York, the details of which were left to M & N's discretion with the exception that the completed structure in Oxford conform to the overall design of York's existing rental property in Hattiesburg.
¶ 27. On this note, we return to the issue presented on appeal and our standard of review of motions for directed verdict. Upon a review of the facts presented at trial, we hold as to both York and M & N that reasonable minds could differ after taking into account all favorable inferences which could have been reasonably drawn in favor of the non-moving party, Houston in this case. There is a jury issue as to whether York as a landlord/owner acted as a reasonable landlord should have in similar circumstances in using reasonable care to provide safe premises fit for human habitation through the inspecting, maintaining, and repairing of the residential lease unit. There is also is a disputed issue of fact from which reasonable minds could differ in reaching a verdict as to M & N's liability in whether they were negligent in the design, construction and securement of the mantle which fell and *503 struck the plaintiff on the head. Having said this, we therefore hold that the trial court was in error in granting a directed verdict in favor of both York and M & N.
¶ 28. THE JUDGMENT OF THE LAFAYETTE COUNTY CIRCUIT COURT IS REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS ARE ASSESSED AGAINST THE APPELLEES.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, COLEMAN, DIAZ, IRVING, LEE, AND PAYNE, JJ., CONCUR.