882 So.2d 245 (2004)
Timothy V. ROSS, Todd Ross and Champion Industries, Inc., Appellants
v.
NATIONAL FORMS & SYSTEMS GROUP, INC. and Mickey McCardle, Appellees.
No. 2002-CA-01182-COA.
Court of Appeals of Mississippi.
June 22, 2004.
Certiorari Denied September 16, 2004.
*247 April D. Reeves, Jackson, David Lee Sandefur, and Neville H. Boschert, Laura L. Gibbes, Jackson, attorneys for appellants.
Reuben V. Anderson, Gary E. Friedman, James W. Craig, Jackson, attorneys for appellees.
EN BANC.

MODIFIED OPINION OF MOTION FOR REHEARING[1]
BRIDGES, P.J., for the Court.
¶ 1. Timothy V. Ross, et al. are appealing from the Hinds County Circuit Court's verdict in favor of National Forms & Systems Group, Inc. and Mickey McCardle, on all counts for $1,744,937 in compensatory damages and $750,000 in punitive damages. The verdict was later amended to include $645,119 in attorney's fees and expenses for a total judgment of $3,140,056. The issues are stated verbatim.
STATEMENT OF THE ISSUES
I. THE TRIAL COURT ERRED IN FINDING AS A FACT THAT TIM WAS PRESIDENT OF NATIONAL AND THAT TIM OWED FIDUCIARY DUTIES TO NATIONAL AS A MATTER OF LAW.
II. THE TRIAL COURT ERRED IN FAILING TO GRANT DEFENDANTS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR FOR NEW TRIAL BECAUSE TIM DID NOT BREACH FIDUCIARY DUTIES AS A MATTER OF LAW.
III. THE TRIAL COURT ERRED IN FAILING TO GRANT DEFENDANTS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT FOR NEW TRIAL BECAUSE DEFENDANTS DID NOT TORTIOUSLY INTERFERE WITH NATIONAL'S CONTRACTUAL AND BUSINESS RELATIONS AS A MATTER OF LAW.
IV. THE TRIAL COURT ERRED IN FAILING TO GRANT DEFENDANTS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR FOR NEW TRIAL BECAUSE DEFENDANTS DID NOT COMMIT CIVIL CONSPIRACY AS A MATTER OF LAW.
V. THE TRIAL COURT ERRED IN FAILING TO GRANT DEFENDANTS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR FOR NEW TRIAL BECAUSE NATIONAL FAILED TO PROVE PROXIMATE CAUSATION AS A MATTER OF LAW.
VI. THE TRIAL COURT ERRED IN FAILING TO GRANT DEFENDANTS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR FOR NEW TRIAL BECAUSE NATIONAL FAILED TO PROVE ACTUAL AND PUNITIVE DAMAGES AS A MATTER OF LAW.
VII. THE TRIAL COURT ERRED IN FAILING TO GRANT THE DEFENDANTS' MOTION TO DISMISS BASED UPON NATIONAL'S AND McCARDLE'S MATERIAL MISREPRESENTATIONS TO THE COURT.

FACTS
¶ 2. Timothy V. Ross began working for National Forms & Systems Group, Inc. *248 (National), as a sales representative in mid-1998. Tim previously worked as a sales representative for Dixie Data, from 1991 until 1997, which sells a product similar to National's. Tim began working for National as an independent contractor bringing with him existing customers and soliciting new ones. Tim kept 75% of the gross profits and paid for all sales expenses himself. His relationship was similar to National's relationship with other salesmen, namely Bill Conner and Al Watts.
¶ 3. National's sole shareholder was a company called Jackson Business Forms, Inc. (JBF). Mickey McCardle was the president of JBF and he was also one of the two directors of National. JBF manufactured and sold forms to distributors. National was a distributor and sold forms to their end users. Therefore National was a competitor of JBF's other customers. JBF had separate offices from National but all of National's billing, invoicing and collection operations were performed at the JBF offices by JBF employees. Also, all sales and accounting records were maintained in JBF offices since the chief financial officer (CFO) of JBF is also the CFO of National.
¶ 4. The independent contractor salesmen National employed were not required to sign non-competition agreements and were not required to sign trade secret agreements in order to protect the confidentiality of customer information. Also, invoices of sale orders had a carbon copy entitled "salesman's copy" which National allowed the salesmen to either keep or throw away.
¶ 5. In February of 1999 Tim became a National employee in order to obtain health insurance and also began leasing a building on Highway 80 in Jackson, Mississippi, rather than working from his home. The work done for National in the JBF offices was not moved to the new offices on Highway 80 and Tim later hired several employees to help him in the Highway 80 office. In order to rent the space Tim had to submit business plans and projections. He did not sign those plans or projections as president nor did he sign the original lease as such but he did sign later lease amendments as president of National. The newly hired employees were individuals he had known and worked with previously at Dixie Data. All of them, like Tim, brought with them existing customers and did not sign non-competition agreements. Many of these employees were unaware of the company's connection with McCardle.
¶ 6. In July of 1999 Tim began signing checks and agreements as president of National at McCardle's request. Tim claims he was unaware that the board had voted him president and that such a position came with fiduciary duties. Tim believed he was signing merely to hide JBF's involvement with National, since it was a competitor to JBF's other customers. Tim also highlights the fact that revisions were done to the July 1999 corporate minutes long after Tim had left National and just before they were submitted for discovery. However, National claims Tim was fully aware of his role as president and the responsibilities it required.
¶ 7. Tim did not have access to any of National's financial information or control over National's accounting method which was changed without his knowledge, authority or consent. This change greatly reduced Tim's salary since it was computed based on gross profits. Tim did not even have keys to the JBF offices where these records were kept. Tim also had no contact with Watts and Conners, National's other independent contractors who did not know Tim had been voted president.
¶ 8. In March of 2000 Tim refused McCardle's proposal for a reorganization *249 of the business requiring him to sign a non-competition agreement and to have Bill Banks become manager of the business. Tim went to his brother, Todd Ross, division manager of the Champion Industries office in Jackson and obtained the name and number of Doug McElwain, a vice president of Champion, and requested a meeting to discuss a possible position with them. Todd knew Tim was an officer of National prior to their discussions; however, McElwain did not. McElwain and Tim had a lunch meeting on March 28, 2000, and at that meeting nothing was decided but either the next day or the day following Tim called McElwain to accept a position with Champion. On March 31, 2000, Tim and McElwain met at the National office, those also present were Lynn Taggart, Bobby Renfroe, and Grady Ross, the employees Tim had hired. How exactly the meeting was conducted and what topics were covered is a matter of debate amongst the parties. However, after the meeting everyone had decided to leave National to work for Champion.
¶ 9. They began selling under the Champion name the next week on April 4, 2000. Tim told McElwain he was leaving on the second or third of April and the other employees resigned on the fourth. Tim began renting the same office space for Champion and the sales people kept their personal files and personal sales records, containing the carbon copy of invoices called "salesman's copy." Tim and his employees also notified their customers of their change in affiliation. The customer owned inventory they took was returned to National within two weeks. However, National adds that a Champion employee, John Whited, took some of National's inventory to the Champion office on April 5, 2000.
¶ 10. On April 5, 2000, when the phone company called McCardle regarding the phone number's changing at the Highway 80 location, McCardle was a bit surprised. Apparently, he still did not know the employees of Tim had resigned and had planned to go to their office to reassure them of their job security. Later that morning when McCardle went to the Highway 80 offices, his first ever visit to those offices, he found the locks changed and believed Tim had "hijacked" his company. For this, National filed suit against Tim Ross, Todd Ross and Champion Industries for conspiracy and breach of fiduciary duties.

ANALYSIS

I. THE TRIAL COURT ERRED IN FINDING AS A FACT THAT TIM WAS PRESIDENT OF NATIONAL AND THAT TIM OWED FIDUCIARY DUTIES TO NATIONAL AS A MATTER OF LAW.
¶ 11. The standard of review on appeal of motions for directed verdict is de novo:
When deciding whether the granting of a motion for directed verdict was proper by the lower court, this Court considers the evidence in the light most favorable to the non-moving party and gives that party the benefit of all favorable inferences that may be reasonably drawn from the evidence presented at trial. Houston v. York, 755 So.2d 495 (¶ 12) (Miss.Ct.App.1999). If those facts and inferences, so viewed, can be said to create a question of fact from which reasonable minds could differ, then the matter should be submitted to the jury, and the directed verdict should not be granted.
Ducksworth v. Wal-Mart Stores, Inc., 832 So.2d 1260, 1262(¶ 2) (Miss.Ct.App.2002).
¶ 12. At the close of evidence the trial court granted motions for directed verdict in favor of National on the issues of *250 whether or not Tim Ross was president of National from July 1999 until April 2000 and whether or not Tim Ross had fiduciary duties to National as a result. On appeal this court reviewed the evidence presented at trial, interpreted such evidence presented to the benefit of Tim, the non-moving party, and found that there were sufficient questions of facts from which reasonable minds could differ requiring these issues to be decided by the jury and not the trial judge.
¶ 13. National presented evidence that Tim had signed numerous documents as president including lease agreements, credit applications, website applications and checks. National even had proof that in his resignation letter that he resigned as president of National. The July 1999 board minutes show he was elected president, but National claims they did not rely solely on this evidence. Also, in their proof National showed Tim had authority to hire and fire at will and therefore exercised his control over employees.
¶ 14. It is Tim's theory that McCardle only wanted him to appear to be the president of the company in order to disguise McCardle's involvement with National. This was because JBF's customers would not appreciate their supplier actively competing with them. There was evidence that the minutes for the July 1999 meeting when the board supposedly elected him as president were revised long after Tim left the company before they were due for trial discovery. Tim offered proof that McCardle continued to file documents and hold Tim out as president of National more than a year after he left the company. He also presented evidence that he did not know of his official election to the office of president by the board of directors and received no additional compensation for the position. In fact, Tim submitted that he never attended a single board of director's meeting as the president of the company is required to do under National's bylaws.
¶ 15. Most of Tim's evidence showed that while Tim may have held himself out as president of the company to third parties he had no actual control of the company the way a true president of a corporation would. McCardle, who is not a third party, would have known of Tim's limitations. Tim had no control over the tax and accounting policies of the corporation which were changed without his knowledge or approval. Tim proved that he never even had keys to the administrative offices of National and that the other independent contractors were not told that Tim had been elected president of the company.
¶ 16. The conflicting evidence does create a question of fact. A question of fact is created if "one party swears to one version of the matter in issue and another says the opposite" and a directed verdict should not be granted when a question of fact exists. Regency Nissan, Inc. v. Jenkins, 678 So.2d 95, 99 (Miss.1996). National and Tim both offered plenty of evidence to support their claim on the issue of Tim's presidency, and the trial judge's granting a directed verdict took the decision away from the jury. The jury is "the traditional finder of the facts, and not the court." It should be the jury that "weigh[s] conflicting evidence and inferences, and determine[s] the credibility of witnesses" not the trial judge as it was in this case. Miss. Transp. Comm'n v. Highland Dev. LLC, 836 So.2d 731, 737(¶ 24) (Miss.2002).
¶ 17. The decision of the trial judge granting the directed verdict in favor of National on the issue of Tim Ross's presidency and his resulting fiduciary duties was in error. This case is remanded to the lower court to allow a jury to consider these questions of fact. The determination on this issue makes the determination of *251 issues II, III, IV, V, VI presented before this Court moot because they involve motions for new trial and judgment notwithstanding the verdict. These are motions which are based on the verdict of a jury which, because of the above reasoning, did not consider all the evidence it should have.

VII. DID THE TRIAL COURT ERR IN FAILING TO GRANT THE DEFENDANTS' MOTION TO DISMISS BASED UPON NATIONAL'S AND McCARDLE'S MATERIAL MISREPRESENTATIONS TO THE COURT?
¶ 18. Tim Ross moved to dismiss prior to trial and renewed the motion after trial claiming numerous misrepresentations during discovery by National and McCardle regarding a prior lawsuit between McCardle and Fromcraft, McCardle's prior employer. Tim believed the lawsuits to be similar in nature to the one in question now and that it gave McCardle the motive and idea for the current lawsuit. However, a motion in limine prevented this issue from being raised during the trial. The severity of a penalty for discovery abuses is a matter for the sound exercise of trial court discretion. "The power to dismiss for violations of rules of procedure `is inherent in any court of law or equity, being a means necessary to orderly expedition of justice and the court's control of its own docket.'" Palmer v. Biloxi Regional Medical Center, Inc., 564 So.2d 1346, 1367 (Miss.1990) (quoting Watson v. Lillard, 493 So.2d 1277, 1278 (Miss.1986)). This Court reviews for whether the discretion was abused. Palmer, 564 So.2d at 1368.
¶ 19. It is only in extreme circumstances that a trial court should dismiss a suit for failure to comply with discovery requirements. Pierce v. Heritage Properties, Inc., 688 So.2d 1385, 1388 (Miss.1997). The trial court's decision will be affirmed absent our "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors." Cooper v. State Farm Fire & Cas. Co., 568 So.2d 687, 692 (Miss.1990).
¶ 20. In the Pierce case the court found the misrepresentations in the discovery process were willful and the result of admittedly false responses to discovery requests and by false testimony in depositions. Pierce, 688 So.2d at 1390. The circuit judge in Pierce found the answers to be "manifestly false" and constituted bad faith. Id. In the present case the judge did not find that the misrepresentations rose to the level of being manifestly false and he "was not convinced that there had been any lying." Tim did not offer support that the misrepresentation made by National and McCardle during discovery were manifestly false to an extent requiring dismissal. Therefore, it was not an abuse of the trial judge's discretion to deny dismissal because of those discovery violations. The ruling of the trial judge denying Tim Ross's motion to dismiss is affirmed.
¶ 21. National argues on rehearing that we should remand solely on the issue of the duty owed, if any, by Ross to National. We were asked to leave the amount of damages undisturbed, subject to the contingency on remand of liability being found. A reversal solely of part of a judgment occasionally occurs, but only when the reversal is due to an error that an appellate court can with confidence find could not have affected other contested issues in the case. See Peterson v. Ladner, 785 So.2d 290, 294-95 (Miss.Ct.App.2000). We do not have that confidence here. We reverse and remand on all issues.
*252 ¶ 22. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS REVERSED AND REMANDED FOR A NEW TRIAL. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.
KING, C.J., SOUTHWICK, P.J., THOMAS, LEE, IRVING, MYERS, AND CHANDLER, JJ., CONCUR. GRIFFIS, J., NOT PARTICIPATING.
NOTES
[1] The motion for rehearing is denied. The original opinion is withdrawn and this opinion is substituted therefor.